## THE BELLINGHAM.

### UNITED STATES v. A. C. MONK & CO.
#### No. 4445.

Circuit Court of Appeals, Third Circuit.
April 5, 1932.

Phillip Forman, U. S. Atty., of Trenton, N. J. (Wm. E. Collins, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Bigham, Englar, Jones & Houston, of New York City, and McDermott, Enright & Carpenter, of Jersey City, N. J. (T. Catesby Jones, and James W. Ryan, both of New York City, of counsel), for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMSON, District Judge.

**THOMSON, District Judge.**

This is an appeal from an interlocutory decree dated May 23, 1930, directing that libelant recover damages as directed in the decree, in a suit for cargo damage. The decree was entered without opinion, but an opinion was thereafter filed on April 8, 1931. (D. C.) 49 F.(2d) 442. Amended assignments were therefore filed after the opinion. Two suits are involved in the case before the court. The libelant, at the same time, filed two actions; one being the present suit for cargo damage, and the other for general average contribution, etc. Both suits arise out of the same voyage of the Bellingham, and relate to the same cargo, viz., a shipment of 101 hogsheads of tobacco and tobacco stems. The actions were not consolidated, but were tried together by consent. While the cases depend largely upon the same state of facts and the same record, they rest upon different and conflicting theories. The opinion of the court disposes of the two cases, finding for the libelant in the cargo damage suit and for the respondent in the general average case. In the latter case, the court dismissed the libel, and an appeal therefrom is before this court, but not included in this record. When reference is made in this opinion to the libel, it refers to the suit for cargo damage.

The libel alleges shipment on the Bellingham from New York, about December 12, 1919, of 101 hogsheads of tobacco, in good order and condition, pursuant to a bill of lading which provided for the delivery in good order to the libelant at Rotterdam, Holland. It is alleged that the ship sailed with the tobacco on board, arrived at Rotterdam, and there discharged the tobacco, but not in good order and condition, the delivery being short, the tobacco seriously damaged by steam, fresh water, sea water, and other substances, through the alleged fault of the ship, her owners and agents. It is also alleged that respondent failed to make proper delivery of the goods or to put them in craft or store, in accordance with the terms of the bill of lading, but discharged the tobacco on an open quay where it was permitted to remain without any protection from the weather; and, although duly demanded, refused to deliver the tobacco to the libelant, and until the 20th of July, 1920, neglected to store any part of it in a warehouse for protection from the weather. Damages are demanded in the sum of $65,000.

The answer, in substance, admits the shipment of the tobacco and its carriage to Rotterdam, and alleges the proper carriage of the goods and the discharge thereof upon a suitable pier, in accordance with the terms of the bill of lading. It also alleges that due notice was given to the parties named in the bill of lading of the vessel's arrival, and that any damage to the merchandise was not due to any negligence of the respondent or its agents. The answer also sets up failure of the libelant to give notice of claim or to commence suit within the time prescribed by the bills of lading.

In the general average case, the libel alleges the same shipment, and that, after it was loaded on the ship, a fire occurred which made it necessary to pump steam and water into a hold adjacent to that where libelant's tobacco was stowed; that the tobacco was damaged by this general average act, but that respondent, through its adjusters and agents, failed to pay the libelant its proper contribution in general average, on account of said damage, except on 12 hogsheads. The libel prays for a decree awarding to libelant its proper contribution in general average. The answer admits the shipment, stowage on the vessel, and the fire, but denies that any of the libelant's tobacco was damaged as a result of the general average act, except 12 hogsheads, for which the libelant has been paid.

It will thus appear clear from the pleadings that the libel for cargo damages rests upon the claim that the tobacco was damaged through exposure on the pier at Rotterdam, while the general average libel rests upon the contention that all of the tobacco was damaged by the general average act.

It would appear from an examination of the record, that the libelant relied upon the general average suit, but the court granted libelant relief in the cargo action, which the record appears to show had been abandoned to all intents and purposes by libelant.

The facts, as stated by the District Judge, are substantially undisputed, and the substantial questions are as to the conclusions of fact and law to be drawn therefrom. From the whole record, the following facts appear to be clearly established:

The tobacco consisted of 98 hogsheads of leaf tobacco and 3 hogsheads of stem. The bills of lading were offered in evidence, and there is nothing to show that the stems are involved. The bills of lading are dated November 26, 1919. The tobacco was stowed in No. 2 lower hold of the ship. Near midnight of October 29, 1919, a fire broke out in the after part of No. 3, at a point about 68 feet from the libelant's tobacco. The facts concerning the fire, and the means employed

to extinguish it, are set forth with accuracy in the court's opinion. While the fire was serious, it was localized in the after part of No. 3 between deck. During all of this time, the ship's pumps were employed in pumping the bilges of No. 2 hold, into which the water found its way. In spite of the operation of the pumps on No. 2 bilges, water rose in that hold to a height of 2½ feet above the tank top, and thus came in contact with some of the cargo in the No. 2 hold.

It cannot be disputed that the damage to cargo caused by putting out the fire was a general average act, and the trial court so finds. A general average adjustment was, accordingly, arranged by the owners of the ship. The surveyor, after a careful exami-nation of the cargo of the ship, including the tobacco in No. 2 hold, had the tobacco in that hold removed to lighters alongside. He found that twelve hogsheads in the lower tier had been damaged by actual contact with the wa-ter, and they were included in the general average. The surveyor found that the re-maining 89 hogsheads had not been damaged by water, steam, or moisture, or in any other way, by the general average act. These 89 hogsheads, those found to be sound, were reloaded into the ship and transported to Rotterdam. There is no evidence that any-thing occurred during the voyage to affect the condition of this tobacco, and all of it was discharged on the pier by January 24th. Notices of arrival were sent by the Rotterdam agents of the vessel to the parties named in the bills of lading. No one appeared to take delivery or claim the tobacco. The tobacco was discharged into a shed called the "Can-ada," a temporary discharge shed, and was thereafter stored on the pier over logs and cinders and covered by tarpaulins.

On account of a state of congestion, no warehouse could be obtained for the storage of the tobacco. It is also uncontradicted that a certain strike of longshoremen and other dock workers paralyzed the port and made warehousing impossible. This strike contin-ued from February 14th to April 28th. The evident reason for the failure of the con-signees named in the bills of lading to make any effort to take delivery of the tobacco is that the consignees had become insolvent. This is admitted.

As a result of the foregoing situation, the tobacco remained stored in the manner above described until July 20, 1920, when it was finally possible to store it in a warehouse. Before that time, under the evidence, it was impossible to find warehouse space.

When the tobacco was put in the ware-house, after having been exposed to the changing elements, including considerable rain, for six months, the tobacco was found to be seriously damaged, being examined by a number of parties, including the one who had examined it at Hoboken; and it was the opinion of all that the damage was from the outside by exposure to the weather, it being evident that the containers had been penetrat-ed by water, and not from any condition of moisture in the ship's hold.

The tobacco being stored in the warehouse, actual delivery was made to the consignees when the bills of lading were delivered by the ship's agents in August and September of 1920. Notwithstanding the clear provisions of the bills of lading, calling for notice of claim, no claim of any kind, either written or oral, was made by the consignees, the libelant, or any other party concerned, until the pres-ent suits were filed on June 6, 1922.

The court held that the primary question was where the damage occurred; whether in the ship's hold in Hoboken or on the pier at Rotterdam; and found that the latter was the place of damage. Under this finding, the court held that the respondent was the bailee of the tobacco under a warehouseman's lia-bility, and that it was negligent in storing the tobacco on the pier instead of putting it in a warehouse. That the tobacco was damaged, as found by the court during the period of six months when it remained upon the pier under tarpaulins, is scarcely open to ques-tion. If this be true, the tobacco could not have been damaged as a result of the general average act, but the court concluded, not only that the damage occurred at the pier at Rotterdam, but that it was caused by the negligence of respondent or its agent.

There seems to be no question from the uncontradicted evidence, particularly that of the libelant, that the strike tied up the entire port of Rotterdam continuously from Febru-ary 14th to April 28th, and that a congestion existed from the arrival of the ship until July, which made it impossible to find ware-house space. There seems to be no evidence whatever, to support the suggestion that re-spondent could have found warehouse space for the tobacco.

The basis of the Court's finding of neg-ligence of the ship's agents rests solely on the fact that the tobacco was stored on the pier and not placed in warehouses. It is not the court's position that there was any lack of care in protecting the tobacco, as far as it could be protected, on the open pier. Such

finding would have been contrary to the evidence of the libelant.

 From the foregoing, it is evident that the two cases rested on different and conflicting theories advanced by the libelant itself. When libelant advanced the theory that the entire damage existed when it was placed in the warehouse six months after discharge and was due to contact with water as a result of the general average act, it was then compelled to establish, not only that the damage occurred in that manner, but that it could not have occurred on the Rotterdam pier. Hence, libelant's witnesses in the general average case insisted that the tobacco could not have been damaged on the pier, protected as it was, and also showed that it was impossible to obtain warehouses for storage. The two theories being thus utterly inconsistent, the libelant was driven necessarily to electing between the two theories, and, in doing so, practically abandoned the cargo suit.

That the cargo suit was, in effect, abandoned, is shown in the opening statement of counsel for libelant that the tobacco could not have been damaged on the pier at Rotterdam. Fol. 766. At Fol. 785, 786, libelant's counsel stated, in effect, that he was not making any point of the cargo suit. Afterwards, he modified this stand to some extent, by reserving the right to recover for any damage caused by improperly restowing the tobacco on the ship after its examination in general average.

The record in the general average case demonstrates, by the testimony of witnesses on both sides, that the tobacco was so well protected that it could not have been damaged on the Rotterdam pier. In such a case of inconsistent remedies, there was a clear duty of libelant to elect its remedy, and is bound by the election so made. Many cases to this effect might be cited.

It appears clear from the pronouncements of libelant's counsel, from the position taken by libelant's president and libelant's entire case, that it definitely decided to rely upon the cause in general average, and thus abandon the present suit for cargo damage.

 There is also a serious technical objection which lies in the way of libelant's recovery. The libel alleges that the tobacco was shipped and transported pursuant to the terms of a bill of lading, which bills were put in evidence. There was evidently no compliance with the clause in reference to suit within three months, since the tobacco was delivered in 1920 and suit was filed on June 6, 1922. Nor was there any compliance with the notice clause, which denies liability for any claim unless written notice shall be given to the carrier with statement of particulars, before the removal of the goods or a portion thereof, delivered within ten days of the final discharge of the vessel. These clauses have been before the Supreme Court in numerous cases, and their validity repeatedly affirmed.

 There can be no question concerning the legal status of the respondent while in possession of the tobacco, after its discharge upon the pier. The bill of lading, section 5, provides: "It being expressly agreed that the carrier's responsibility for any and all goods shall terminate immediately upon delivery of the goods from the steamer's tackle." Other like provisions exist in the bill of lading.

After termination of the carrier's liability, the respondent was under the sole duty of exercising ordinary care. This is shown by a large number of cases. If any duty, for any time, rested upon the respondent as a warehouseman, after the discharge of the cargo, the burden rested upon the libelant to prove want of due care. It seems perfectly apparent, under the facts of the case, which are practically undisputed, that reasonable care had been exercised by the respondent in the discharge of the cargo, and the injury which resulted thereafter was due to the negligence of the consignee in failing to take charge of the goods on notice.

Under the facts of the case, which are not seriously in controversy, and the applicable principles of law, the decree should be reversed.