**ISTHMIAN STEAMSHIP COMPANY, a Corporation, Appellant,**

**v.**

**CALIFORNIA SPRAY-CHEMICAL CORPORATION, a Corporation, Appellee.**

**No. 16812.**

United States Court of Appeals Ninth Circuit.

Jan. 26, 1962.

McCutchen, Doyle, Brown & Enersen, by Russell A. MacKey and Bryant K. Zimmerman, San Francisco, Cal., for appellant.

Hall, Henry, Oliver & McReavy, by Lyman Henry and Stephen McReavy San Francisco, Cal., for appellee.

Before POPE, BARNES, and HAMLIN, Circuit Judges.

On petition for rehearing appellant filed a vigorous and extensive[1] brief.

1. Appellant's petition for rehearing was eleven pages longer than its opening brief *and* closing brief combined.

With increasing frequency counsel seem to be confusing the function of a petition for rehearing with the rehearing itself, and the hearing of the petition with a second appeal. The petition for rehearing filed in this case was a reargument of the appeal. In addition to the seventeen cases which were cited in appellant's original opening brief, and the additional thirty in his reply brief, seventeen additional cases were cited on the petition for rehearing. See 44 Cal.L.Rev. 627, particularly p. 658.

It raises questions regarding all of the main issues which were before the court on the original consideration of the appeal. We granted a rehearing, and the matter was again argued at length, and we again *affirm* the judgment below.

1. Validity of the Lighterage Clauses.

This court's opinion rested, essentially, upon the reasoning embodied in the trial court's decision. Both decisions hold that appellant cannot, by contract, avoid liability for negligent injury to cargo when such injury occurs before the cargo is delivered to a fit and proper wharf. This result stems from an application of Section 1 of the Harter Act, 46 U.S.C. § 190.

The Harter Act was adopted

> "* * * to remedy abuses which had arisen through the efforts of shipowners engaged in common carriage to limit unreasonably their obligations as carriers of goods. Sections 1 and 2 (46 U.S.C.A. §§ 190, 191) forbid them to relieve themselves from certain responsibilities incident to their public calling, even by contract with the shippers * * *." (Koppers Connecticut Coke Co. v. James McWilliams Blue Line, 2 Cir. 1937, 89 F.2d 865 at 866.)

In pertinent part, Section 1 of the Act provides:

> "It shall not be lawful for the manager, agent, master, or owner of any vessel * * * to insert in any bill of lading * * * any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care or proper delivery * * *. Any and all words or clauses of such import inserted in bills of lading * * * shall be null and void and of no effect."

It would seem, then, that any attempt by the carrier to avoid liability for losses arising before delivery must fail. Once proper delivery has been made, however, the carrier's liability, as far as the Harter Act is concerned, is at an end. It is, therefore essential to determine *what* a proper delivery is, and *when* such delivery is completed. The court below and this court on appeal held that a proper delivery, as defined by general maritime law, occurred when the cargo was deposited upon a fit and proper wharf. Appellant contends that there was no common law or maritime rule requiring such delivery and chides this court for discovering such a rule relying upon a dictum in Tan Hi v. United States, N.D.Cal.1950, 94 F.Supp. 432.

It is true this court did cite and rely upon Tan Hi, but Tan Hi in turn relies upon numerous cases, only one of which is cited or discussed by appellant. These cases establish the existence of a common law (maritime) obligation on the part of the carrier to deposit or "land" the goods on a wharf. As stated in The Mary Washington, 16 Fed. Cas. page 1006, No. 9,229, "The duty of a carrier by water is not fulfilled by transportation from port to port. The goods must be delivered, or at least landed * * *." And in The Eddy, 1886, 5 Wall. 481, 495, 72 U.S. 481, 495, 18 L.Ed. 486, it was said: "Where the contract is to carry by water from port to port an actual delivery of the goods into the possession of the owner or consignee, or at his warehouse, is not required in order to discharge the carrier from his liability. He may *deliver them on the wharf* * * *." (Emphasis added.) In The Titania, 2 Cir. 1904, 131 F. 229, 230, the court noted that: "In order to make a valid delivery, which relieves the carrier from liability, it is necessary to show that the goods in question were *landed on the wharf* * * *." (Emphasis added.) See also Vose v. Allen, 28 Fed.Cas. page 1283 No. 17,006; The Illinois, 29 Fed.Cas. page 259, No. 17,185; The Grafton, 10 Fed.Cas. page 907, No. 5,656 aff'd. 10 Fed.Cas. page 905, No. 5,655 and 2 Parsons, On Contracts, 5 ed. 1886, pp. 190–193. We also note that the dictum in Tan Hi was quot-

ed at length, with approval, in Norjac Trading Corp. v. The Mathilda Thorden, E.D.Pa.1959, 173 F.Supp. 23. Indeed, the carrier's general maritime obligation not only required it to deposit the goods upon a fit wharf, but to segregate the consignee's goods from the general cargo and to give the consignee notice of their arrival. (See e. g., The Titania, 2 Cir. 1904, 131 F. 229.) There is, then, strong support for the existence of a "common law" or maritime rule requiring delivery to a wharf unless the bill of lading specified elsewhere. Appellant's assertion that this rule was not urged by appellee and was not briefed is patently incorrect.[2] See Calderon v. Atlas S. S. Co., 1898, 170 U.S. 272, 18 S.Ct. 588, 42 L.Ed. 1033, and The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 522–523, 40 L.Ed. 771.

In giving effect to the provisions of a bill of lading, the conditions and circumstances which the evidence proves were known to the parties and contemplated by them in making it, are to be taken into consideration. Pacific Coast Co. v. Yukon Independent Transp. Co., 9 Cir. 1907, 155 F. 29; W. R. Grace & Co. v. Frank Waterhouse & Co., Inc., 9 Cir. 1920, 264 F. 422. We believe that here the parties understood that the obligation created between them required delivery to the wharf. No receipt was asked for nor obtained by the carrier *from the lighterman.* But when the goods left the lighters for customs, a receipt was *then* obtained by the *carrier.* Again, when the lighter sank, it was the carrier who was notified of the loss. (Answer, Interrog. 18(a) (1).) An inspection of the lighter was made, for the respondent, both prior to and immediately following the loading of the lighter, and after the breaking loose and first discharge "onto Quay 58." (Ans. to Interrog. 16.)

Admittedly every carrier is responsible for the discharge of cargo from the vessel to a safe place. The Tangier, 1859, 23 How. 28, 64 U.S. 28, 16 L.Ed. 412. The basic freight rate includes the cost of unloading. Under the facts of this case, in Alexandria, the carrier hired a contractor to do the unloading. That contractor in this case also operated the lighters. Its duty was to deliver to Egyptian Petroleum Storage Company as agent for the Egyptian customs authorities. The carrier paid for the stevedoring which put the cargo onto the lighters. The consignee was notified by the carrier, prior to arrival at Alexandria:

> "In view of the congestion existing at present on the petroleum quays, it is materially impossible *to deliver your cargo 48 hours after discharge.* We would, therefore appreciate it if you could arrange to have your own lighter ready upon vessel's arrival to take delivery of this consignment. * * * Failing to make arrangements as above, we would be obliged to charge you with the hire of the lighters *after 48 hours of ship's discharge.*" (Emphasis added.) (Exhibits E and F.)

No such lighterage was provided by the consignee. The bill of lading provided (in paragraph 15):

> "If the carrier elects to lighter goods *in or with lighters or craft operated or controlled by it,* the carrier shall have the benefit of all the terms of this bill of lading with respect to such lighterage, and may collect the cost thereof from shipper *or* consignee." (Emphasis added.)

Thus the carrier contracted under the assumption that there could be lighters used to effect delivery which would be operated or controlled by the carrier *prior to delivery.* In fact, no charge was made to the consignee until forty-eight hours after deposit by the ship's tackle onto the lighters. Any such charge was "swallowed" in the freight rate charged by the carrier for delivery at Alexandria.

2. See Appellee's Brief, pp. 8–10.

Appellant urges that the forty-eight hour "no charge" is part of the tariff—Exhibit 6, and we accept that statement. The only part of Exhibit 6 printed in the transcript of record on appeal (p. 13) relates to carriage of goods from one quay "where the steamer has effected her discharge," to other quays. That provision is not here applicable.

On the petition for rehearing appellant places great reliance on a case which (with many others) does not appear in its opening brief: W. R. Grace & Co. v. Frank Waterhouse & Co., Inc., supra. That involved the delivery of goods consigned to San Francisco, California, at Seattle, Washington, where they were delayed by a stevedore's strike and damaged. The parties knew there had to be such a transshipment, because San Francisco was not a port of call for the vessel. Alexandria, Egypt, unlike San Francisco, was not "beyond a port of call." Here there was no transshipment, no on-carriage—contemplated on required—beyond the port of call. The port of call here was Alexandria, to which, and no farther, carriage was contemplated by both parties to the contract.

Appellant cites some authority which suggests that the carrier was not *invariably* required to deliver to a wharf. Thus it is stated in The Tangier (Richardson v. Goddard), 1859, 23 How. 28, 64 U.S. 28, 16 L.Ed. 412, that the carrier "is not bound to deliver at the warehouse of the consignee; it is the duty of the consignee to receive the goods out of the ship or on the wharf." (Id. p. 39.) This dictum, however, does not tell us when, where or how the consignee may be required to "receive goods out of the ship." Indeed the phrase may mean merely that the consignee might in some instances be required to take delivery directly off the ship when it has *docked at a wharf*. There is nothing in that opinion to indicate that a carrier under the general maritime law and in the absence of a special agreement could terminate his obligation by depositing the goods in lighters. The case deals only with the requirements of a proper wharf delivery, and the language relied upon by appellant is pure obiter dictum. The maritime rule upon which this court and the court below relied is, we continue to believe, supported by strong authority which is not diminished by any authority or argument presented by appellant.

At this point appellant would again insist that his position has been misrepresented. His point is, as evidenced by the heading of his argument on page eight of the petition for rehearing, that the general maritime law recognized lighterage *agreements* and that therefore the common law did not require wharf delivery. Thus it is suggested, the "proper delivery" referred to in the Harter Act permits *agreements* which provide for delivery to lighters as well as delivery to a wharf.

But the Harter Act must be interpreted in light of the common law as it was, unmodified by the agreements which it permitted. As we have seen, the very purpose of the Harter Act was to prevent the carrier from avoiding its common law responsibilities by the device of securing "agreements" which included exculpatory clauses. To define the common law standards imposed by the Harter Act by reference to the contractual modifications which the common law permitted, would obviously destroy the Act. To say that the Harter Act permits parties to "agree" to lighter delivery because the common law permitted such "agreements," is to perpetuate the evil which the Act sought to eradicate; viz. the cession by "contract" of rights which would otherwise exist.

This brings us to what is, in our opinion, appellant's main point in its petition for rehearing. Appellant contends (at pp. 24–27 and 32–37) that Section 1 of the Harter Act does not deal with the scope of the carrier's obligation to deliver. The Act, appellant asserts, does not determine whether, when or where the carrier must deliver the cargo. It only prevents the carrier from avoiding liability for loss arising from negligence in delivery, *when* the carrier has, in fact, undertaken to deliver the cargo.

Acceptance of such a contention, we believe, weakens the Harter Act, and runs counter to its spirit and purpose. The Act provides that the carrier may not relieve itself of liability for loss due to negligence in the custody, care or proper delivery of cargo. As we have seen, proper delivery is accomplished when the cargo is placed on a fit wharf. In the instant case, the negligence which caused the loss occurred *before* such proper delivery was accomplished. If, then, the bill of lading clause involved here is sufficient to save appellant harmless, the Act will have been circumvented. The carrier will have inserted a "clause * * * whereby it [was] * * relieved from liability for loss * * * arising from negligence, fault, or failure in * * * custody, care, or proper delivery * * *."

We do not intend to say that appellant's position is unreasonably assumed or entirely without merit. It is plausible for appellant to argue that since its contract with the shipper ended its transportation undertaking as soon as the cargo had been deposited in the lighters, it is not liable for any injury which occurred after such delivery to the lighters. The difficulty with this interpretation is that the Harter Act seems to contemplate a *carrier liability* which continues up until "proper delivery" has been effected, regardless of when the carrier's *obligation to transport* the goods ceases. It is the office of the Act to nullify any bill of lading clauses which diminish or destroy this liability. Since the clauses in issue not only provide for lighterage, but *also* relieve appellant from liability for negligence during lighterage, they run counter to the provisions of the Harter Act. The clauses are, therefore, invalid insofar as they purport to relieve appellant of liability for losses due to negligence during lighterage.

As appellee contended and as this court pointed out in its opinion, appellant's position leaves no scope for application of the Harter Act. The Carriage of Goods by Sea Act in large measure supersedes the Harter Act, but the Harter Act is still applicable during the period following discharge and before delivery. If, however, "proper delivery" is completed as soon as the cargo leaves the ship's tackle and is received by the lighterman, the Harter Act provisions can never become operative. Appellant asserts that this position is logically incorrect; it maintains that discharge and delivery often occur "at the same instant, but [that] they involve different *obligations and functions*." (Petition, p. 16.) Appellant points out, for example, that if the carrier were to deliver to a "wrong party," it would be liable for "improper delivery." On the other hand, if it delivered directly to the consignee, there would be a proper delivery immediately upon discharge without any time period for the Harter Act to operate.

Let us accept appellant's contention that discharge and delivery often occur simultaneously and that the Harter Act then does not operate over a period of time but does have operative effect with respect to the function and responsibility of "delivery." But even this limited scope for the Harter Act does not exist in the instant case, under appellant's theory. It is appellant's position that all of its obligations terminated when it transferred the cargo to the lighterman of its choice. If the lighterman thereafter does not deliver to the consignee, but wrongfully delivers to another party, that is none of appellant's affair. Appellant has, thus, successfully contracted in such a manner as to avoid all liability for improper delivery. Not only is there no "time period" during which the Harter Act can operate, there is also no "function or responsibility" upon which the Act can operate. We think it clear that the purpose of the lighterage clauses in issue here is to attempt to avoid carrier responsibility for improper delivery. But the Harter Act makes unlawful all such attempts.

Appellant further attacks the court's opinion for holding the lighterage clauses "entirely void." Appellant contends that the clauses are valid to the extent

that they are reasonable (Petition, pp. 20–24), and that even without the clauses, appellant had authority to arrange for necessary on-carriage (pp. 30–32).

This portion of appellant's petition is based upon a misreading of the court's opinion, for the court did not purport to hold the clauses invalid in their entirety. The court's opinion did not hold, as appellant seems to believe, that a carrier cannot contract for authority to arrange for lightering of cargo at the shipper's expense; it held only that a carrier cannot relieve itself of liability occurring during such lightering or at any time before proper delivery. To clarify this fact and make the opinion more certain, we suggest that the opinion should be amended by adding the words "the exculpatory provisions of" after the word "think" in line 42 on page 489 of 290 F.2d, and after the word "entirely" in line 19 on page 491 of the opinion. Such amendments are hereby made.

This court intimated that clauses relieving a carrier for liability during *necessary* lighterage, might, conceivably, be held valid under the Harter Act. But it did not decide the point. It pointed out that the clauses involved here were not limited to necessary on-carriage, and that since the exculpatory provisions, as written, are void under the Harter Act, they simply cannot be applied to a case where a conceivably valid exculpatory clause might apply. The Harter Act is clear on this: "Any * * * clauses of such import * * shall be null and void and of no effect." Thus, the invalid exculpatory provisions in appellant's bill of lading could be given no effect. This result is not at war with W. R. Grace & Co. v. Frank Waterhouse & Co., Inc., supra, or Tatsumma Kisen Kabushiki Kaisha v. Robert Dollar Co., 1929, 9 Cir., 31 F.2d 401. Neither of these cases dealt with exculpatory clauses that were in conflict with the Harter Act, for neither case dealt with injury to cargo occurring before delivery.

In short, then, this court did not render the broad decision which appellant apparently thinks it rendered. The court did not say that a carrier is prohibited from securing lighterage agreements and it did not say that such agreements are unlawful or invalid. It said only that the exculpatory provisions of such agreements are void and can be given no effect whatsoever—for such is the command of the Harter Act.

There is one other consideration of importance. Appellant points out that it would not be liable if the bill of lading had called for delivery to the Egyptian Stevedoring and Shipping Company, as on-carrier. Perhaps that is so and it raises an interesting point. Appellant agreed not to deliver to the stevedore, but to deliver to the port of Alexandria. By a broad clause of general applicability it reserved the right to discharge all of its responsibility to cargo by delivering to any on-carrier of its choice. The presence of this standardized clause in the contract does not represent an agreement between appellant and the shipper. It is simply a condition unilaterally imposed by the carrier upon the shipper; in the words of some scholars, it is an "adhesion contract," viz. a contract "in which one party's participation consists of his mere 'adherence'." (Ehrenzweig, Adhesion Contracts in the Conflict of Laws, 53 Colum.L.Rev. 1072, 1075; see also Dessler, Contracts of Adhesion, 43 Colum.L.Rev. 629.) We have already seen that the Harter Act was adopted to prevent the use of just such false agreements which make "freedom of contract" an illusion.

In the instant case, the carrier, by the use of such an adhesion contract, has said to the shipper, "you will authorize us to obtain lighterage whenever we deem it desirable." This much, we have seen, does not conflict with the Harter Act and the court's opinion does not tamper with this portion of the lighterage clauses. Then, the carrier says, "furthermore, we shall in no way be responsible for what happens to your goods during lighterage." This is the language

which the court in its opinion held to be violative of the spirit if not the very letter of the Harter Act.

2. Failure to Show Carrier Negligence.

Appellant continues to maintain that the bill of lading clauses are sufficient to shift the burden of proof and to force the shipper to prove negligence. And such negligence, appellant claims, has not been shown. But appellant does not meet the argument advanced by the court, and the authority which he cites does not undermine the court's position.

The Bellingham, 3 Cir. 1932, 57 F.2d 1015, by dictum, as this court conceded, contains some support for appellant's position. The case does not, however, command a decision in favor of appellant. The clause there in issue does not even purport to relieve the carrier from liability for negligence prior to delivery. Furthermore the cargo was, in fact, delivered to a fit and proper wharf and the only issue concerned damage occurring after such delivery. With respect to *that* damage the shipper had the burden of proving carrier negligence. The Harter Act was not involved nor could it have been since the carrier did not try to escape liability for damage occurring before wharf delivery.

The Monte Iciar, 3 Cir., 167 F.2d 334, does not support appellant's position. The carrier did not attempt to exculpate itself from liability before delivery regardless of its own negligence. The bill of lading provision making the carrier "not responsible for leakage, breakage, or spigoting" (of wine barrels) did not purport to save the carrier harmless from negligently caused damage of the types enumerated. The bill of lading clauses involved in this case would parallel the clauses involved in Monte Iciar, if, for example, they purported to relieve appellant of responsibility "for *any* loss or damage to the goods * * *." (Emphasis added.) This clause, unlike the clause in The Monte Iciar, purports to avoid responsibility for negligence and therefore runs afoul of the Harter Act.

Clark v. Barnwell, 1851, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985, was decided long before the Harter Act was adopted and is, therefore, of no relevance here. Appellant has, then, failed to establish that an exculpatory provision—void under the Harter Act—nevertheless has sufficient vitality to shift the burden of proof. The court's position on this point stands in its opinion unrefuted by logic or authority.

But the court pointed out that, in any event, there was affirmative proof of negligence, so that even if appellee had the burden of proof on this point, the trial court's decision might still be sustained. In part, the court relied upon the inference to be drawn from the "unexplained" sinking of the lighter. Appellant now contends that no inference is permissible because the sinking *is* "explained," but this assertion is in direct conflict with appellant's previous contention that there is "no proof of the cause of the lighter breaking adrift or sinking." (Reply Brief, p. 15.) The point need not be labored, however, since the burden of proof point is sufficient to sustain the original decision.

Appellant renews its argument that the only negligence charged amounted to "errors in management" for which it is not liable. If it seeks to establish such exemption from liability on the basis of its lighterage clauses, it is again met by the provisions of Section 1 of the Harter Act. Appellant claims, however, that Section 3 of the Act itself (46 U.S.C. § 192) provides such an exemption. Section 3 does save the carrier harmless for errors of navigation regarding the *vessel*, but it does not in terms apply to lighters, and its language (referring to the transportation of merchandise "to or from any port") indicates that lighterage is not included. There is nothing to indicate that Section 3 is coextensive with Section 1 except appellant's bald assertion that such is the case (Reply Brief, p. 17).

Furthermore, we agree with appellee that removing cargo from a quay and re-

placing it into an unseaworthy lighter is not an error of management, but is negligence in the care of cargo. The reloading of the cargo may not have been negligently *performed* but it did constitute a negligent act.

Appellant agrees, even under its theory of the case, that the carrier had an obligation to see that the lighter was reasonably fit for the purpose for which it was intended—to have the cargo placed upon it.

The fact of sinking established a prima facie case of unseaworthiness. The district court found:

> "The lighter broke loose from her moorings during a storm which has not been shown to have been so extraordinary as to cause a properly moored craft to break loose. * * * [R]espondent has failed to show that the defect which caused it to sink could not have been discovered by a proper inspection."

Furthermore, as the court pointed out, the exemption for errors of management extends only to errors of the ship's master or crew and the inspection of the lighter was performed by the carrier's *agent* (Ans. to Interrog. 35). Appellant now tells us that the inspector was not the carrier's agent; but appellee in its answering brief had asserted that the inspector was appellant's agent (p. 24), and appellant does not forthrightly deny this assertion in its reply brief. It asserted only that the master and crew had not "surrendered their management" with "an appeal to the owner to resume control himself." (Reply Brief, p. 17.) An uncontroverted statement in an appellee's brief may be taken as true. 5 C.J.S. Appeal and Error § 1345, p. 394. If appellant wanted to dispute the inspector's agency status, it should have done so sooner in the case.

Thus the "error in management" argument must fall on either or both of the grounds originally relied upon.

3. The Real Party in Interest

In its opening brief, appellant argued that appellee had not proved itself to be the owner of the cargo. It contended that the only permissible inference was that title to the cargo passed at the time of shipment relying on California Civil Code, § 1739(4). But as pointed out by the court, applicability of § 1739(4) depends upon the terms of the contract which were not in evidence. Since the shipper was originally the owner of the cargo and since nothing was put in evidence to change that fact, it could be assumed (in fact we must assume)—in support of the judgment—that the shipper was still the owner of the cargo. Appellant had not proved otherwise, and it certainly had not established any ground for invoking § 1739(4) in support of its position. The fact that appellee did not allege itself to be the owner of the cargo does not require this court to accept appellant's argument on this issue. It is now too late for appellant to be offering affirmative evidence of a transfer of ownership at the time of shipment (Petition, p. 46).

Appellant's failure to overcome the "ownership" theory makes it unnecessary to consider its long argument on the "trust" theory. This same failure also disposes of the fourth issue (appellee's failure to give notice of its claim). Since appellee was the real party in interest, it was not required under the terms of the bill of lading to comply with the notice provision.

Upon modification of the original opinion as hereinabove specified, the judgment below is affirmed.

POPE, Circuit Judge (concurring in the result).

While I think the court's opinion reaches a correct result, I cannot agree with that part of the decision which relies upon the provisions of the Harter Act, 46 U.S.C. § 190, for the purpose of invalidating the first part of paragraph 15 of the applicable bill of lading.[1]

1. Paragraph 15 in its entirety reads as follows: "15. The carrier or master, in the exercise of its or his discretion, may at any time, whether or not customary and

I am unable to discover that any court has ever given to the Harter Act the construction which the majority opinion now proposes to give it. Even if it were true, which I am inclined to doubt, that the maritime law, apart from statute, required delivery to be made upon a wharf, as stated in the "dictum in Tan Hi v. United States", 94 F.Supp. 432, I can find nothing in the Harter Act or in the cases which construe it forbidding the parties to agree upon a place of delivery.[2]

I am convinced that the appellant is right in its contention that § 1 of the Harter Act does not deal with the scope of the carrier's obligation as to place of delivery; that the Act does not determine how, when or where the carrier must deliver the cargo but only prevents the carrier from avoiding liability for loss arising from negligence in delivery to such place as the carrier has in fact undertaken to deliver the cargo.

The court's opinion rejects the contention just mentioned on the ground that to accept that "weakens the Harter Act, and runs counter to its spirit and purpose." It is my view that the Harter Act and its purposes must be judged by the language of the Act; I do not subscribe to the majority's undertaking to extend the Act by reference to its "spirit and purpose".

It seems to me that the Harter Act merely avoids agreements relieving the carrier from *negligence* and similar breaches of duty including *improper* loading, delivery, etc. To my mind, the idea of failure to make proper delivery connotes commissions or omissions in the general nature of the failure to use ordinary care. The majority opinion seems to say that "proper delivery" means delivery on a wharf.

I cannot find in the opinion any answer to the appellant's position that there is no limitation in the Act upon the power of the parties to contract or to stipulate where delivery is to be made, providing there is no attempted stipulation that delivery may be made in a negligent or improper manner. Clearly enough the parties may agree whether delivery shall be made at Rotterdam, or Liverpool or Calais. They might stipulate that certain goods were to be delivered to another ship at sea. And no conceivable reason would prevent their agreeing that delivery might be made onto lighters.

without notice, lighter the goods or any part thereof, to or from the ship at the risk and expense of the goods. In making arrangements for lighterage or use of craft, the carrier or master shall be considered solely the agent of the shipper and consignee and without any responsibility whatsoever. The carrier shall not be responsible for any loss or damage to the goods while on such lighter or craft or in the custody of the lightermen who shall be considered independent contractors, including, but without limitation, responsibility for the choice of, condition, seaworthiness or manning of such lighter or craft.

If the carrier elects to lighter the goods in or with lighters or craft operated or controlled by it, the carrier shall have the benefit of all the terms of this bill of lading with respect to such lighterage and may collect the cost thereof from shipper or consignee."

2. I doubt whether the cases cited in support of this dictum really so hold. For instance, in The Eddy, 5 Wall. 481, 72 U.S. 481, 18 L.Ed. 486, the sole question was whether the shipowner had and retained a lien on goods shipped to secure payment of the freight. The master had unloaded the goods upon the wharf, notifying the consignees that the consignment was ready to be delivered on payment of freight, but if they refused to pay freight the goods would be stored at their expense and risk. "The appellants refused to pay the freight, and the master declined to part with the possession of the goods. He discharged the cargo upon the wharf, gave due notice to the consignees, and they refused to pay the freight, claiming that they had a right, by the usages of the port, to remove the goods to their store for inspection, without paying freight." (p. 496) The court, sustaining the shipowner's claim of lien, merely held that he was not required to deliver possession to the consignee, or at his warehouse. No question such as that presented in our case was there involved. Its reference to the wharf had to do solely with the question of the lien for freight.

I would regard it to be a mistake for us now to undertake to hold and thus set a precedent for the proposition that the so-called "lighterage clauses" here, including paragraph 15, are invalid. I am not prepared at this time to agree to a rejection of the appellant's contention that the parties could agree to deliver at some point short of a wharf just so long as they do not attempt to stipulate that the carrier should not be liable for negligence for delivery at that point. In this particular case an agreement to make delivery on a lighter and not upon a wharf would appear to be reasonable, and the master's undertaking to make such delivery would not be an abuse of the discretion mentioned in clause 15, for this was a case where lighterage was absolutely necessary. I cannot find any court decision which has ever held what is proposed in the opinion with respect to the Harter Act invalidating a lighterage clause such as this.

However, I am in accord with those portions of the opinion which note that under the circumstances of the delivery made in this particular case, the appellant did not in truth and in fact undertake to exercise its privileges or its discretion purportedly reserved to it in the first paragraph of clause 15. As the opinion notes, no receipts were taken by the appellant from the lighterman when the shipments were discharged onto the lighters. The order bills of lading covering the shipment were not required to be surrendered to the appellant at that time.

It also appears from the record that the lighters at Alexandria were procured by and the lighterage services were performed in the following manner: American-Eastern Trading and Shipping Company, which represented the appellant at Alexandria, requested the Egyptian Stevedoring and Shipping Company, an independent contractor, to perform the stevedoring and lighterage services. It requested E. Barber & Sons, operators of the lighter, to furnish the lighter. The Egyptian Customs Regulations required the shipment to be landed on the quay of the Egyptian Petroleum Storage Company to be received there by that company as agent for the Customs Authorities and on April 2, 1952, that company for Egyptian Customs acknowledged receipt of the packages from the appellant's agent, American-Eastern Trading and Shipping Company.

The opinion quotes from the letter written on behalf of appellant to the consignee suggesting that the latter could arrange to have its own lighter ready to receive delivery but stating that if that be not done appellant would be obliged to charge appellee with the hire of the lighters after 48 hours of the ship's discharge.

All of these circumstances sufficiently demonstrate that, as suggested in the opinion, the carrier elected to lighter the goods "in or with lighters or craft operated or controlled by it". This is further confirmed by the fact that it was the master of the appellant's ship which undertook to inspect the lighters prior to and immediately following the loading of the lighter, and after the lighter had broken loose during the storm. Inspection was also made of the mooring lines after loading and mooring.

My own conclusion is that this case does not present any situation where we are obliged to pass upon the question of the validity of the first part of paragraph 15 for the reason that the appellant did not undertake to utilize any privileges, discretion or rights purportedly reserved to it in that paragraph. It follows that the appellant's attempted defense under paragraph 15 must fail because of a failure to establish that the appellant undertake to do what this clause purportedly authorized. The result of all this was that those operating the lighter were agents of the appellant, and its responsibility follows from a loss under circumstances which speak for themselves. This ground for affirmance of the trial court's judgment seems to be so plain I would prefer to leave such debatable question as the effect of the Harter Act on these clauses for decision at a time when it was necessary to reach it.