SHIP'S OVERSEAS SERVICE,
INC., Petitioner,

v.

**FEDERAL MARITIME COMMISSION
and United States of America,**

**Michael A. McManus, Jr., Intervenor.**

**No. 80–2421.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1981.
Decided Dec. 24, 1981.

---

**62.** 42 Fed.Reg. 30517 (1977).

**63.** See, *e.g.*, J.App. 83–85, 94.

**64.** See text *supra* at note 12.

**65.** See text *supra* at note 13.

**66.** 5 U.S.C. § 553(c) (1976).

**67.** 43 Fed.Reg. 37672, 37674 (1978).

Frederick L. Shreves, II, Washington, D. C., with whom Edwin Longcope, Washington, D. C., and Allan J. Berdon, New York City, were on the brief, for petitioner.

James P. O'Sullivan, Atty., Federal Maritime Commission, Washington, D. C., with whom C. Jonathan Benner, Gen. Counsel and Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., were on the brief, for respondent, Federal Maritime Commission. Carol J. Neustadt, Atty., Federal Maritime Commission, Washington, D. C., also entered an appearance for respondent, Federal Maritime Commission.

Robert B. Nicholson and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.

Michael A. McManus, Jr., entered an appearance for intervenor, pro se.

Before MacKINNON and GINSBURG, Circuit Judges, and PHILIP NICHOLS, Jr.,* Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case presents the question whether the Federal Maritime Commission (FMC) correctly determined, on the basis of conduct demonstrated to have occurred on a single occasion, that petitioner Ship's Overseas Services, Inc. (SOS) operated as a "common carrier by water in foreign commerce" within the meaning of section 1 of the Shipping Act of 1916, 46 U.S.C. § 801,[1] and was therefore subject to the tariff-filing requirements of section 18(b) of that Act, 46 U.S.C. § 817(b).[2] Two FMC orders

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. Section 1 defines a common carrier by water in foreign commerce to mean:

    a common carrier, except ferryboats running on regular routes, engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country, whether in the import or export trade: *Provided,* That a cargo boat commonly called an ocean tramp shall not be deemed such "common carrier by water in foreign commerce."

2. Section 18(b), *inter alia,* (1) requires common carriers by water in foreign commerce to file with the Commission tariffs containing all their rates and charges; (2) sets forth the conditions upon which tariffs of such rates and charges will become effective; (3) prohibits carriers

are before us for review. The first, entered March 23, 1979, held SOS answerable, as a common carrier by water, to the complaint of a shipper, First International Development Corporation (FIDCO),[3] for failure to file a tariff covering the amount SOS collected from FIDCO. *First International Development Corp. v. Ship's Overseas Services, Inc.*, 21 F.M.C. 899 (1979). The second, entered July 17, 1980, awarded reparation to FIDCO. Joint Appendix (J.A.) 181–96.

We conclude that the FMC's characterization of SOS as a common carrier is "unsupported by substantial evidence" and is "not in accordance with law" previously declared by the courts and the Commission. *See* 5 U.S.C. § 706(2)(A), (E).[4] We therefore vacate the FMC's March 23, 1979, order and, because the record does not establish that SOS is subject to the Shipping Act's tariff-filing regime, we overturn as well the Commission's July 17, 1980, reparation award.[5]

### I.

Commission proceedings in this matter commenced with a complaint for reparation filed by FIDCO, a Delaware corporation engaged in international trade, against SOS, a Washington, D. C., corporation organized to do shipping business in conjunction with Charrier, McAteer & Fettig, a long-established chartering brokerage firm. When the relevant events occurred, in 1975, both FIDCO and SOS were relatively new ventures; FIDCO was organized in 1974, SOS some two years earlier.

FIDCO had received an order for steel pipe from an oil producing company in Lib-

ya. The order contemplated shipment of the pipe from a Spanish mill. However, the pipe available in Spain proved unacceptable to the Libyan purchaser. FIDCO substituted pipe from the United States, which it purchased from Gulf Consolidated International, Inc. To obtain payment for the pipe from the company in Libya, FIDCO was obliged to secure its transportation from Houston, Texas, to Benghazi, Libya. This was FIDCO's "first go at transportation," J.A. 151, and the particular shipment, due to the nature of the cargo and congestion at the port of Benghazi, was difficult to arrange. FIDCO enlisted the aid of Charles Ragan, a full-time employee of Gulf and a former broker representing shippers. With the apparent consent of his employer, Ragan continued to perform brokerage services for shippers on an occasional basis.

Ragan contacted SOS, an enterprise to which he had referred vessel-locating business on several prior occasions. From time to time, Ragan received payments from SOS for business he would bring to it. After two unsuccessful attempts to secure transportation, SOS booked space on a vessel that carried the pipe to its destination in Libya. SOS booked the space and assumed responsibility for the shipment in its own name. It did so, according to the uncontradicted testimony of an SOS vice president, as an accommodation; since FIDCO was a new enterprise without an established reputation, transportation could not be arranged in FIDCO's name. J.A. 91–94.

Initially, SOS did not anticipate a profit on the arrangement. J.A. 92. However, in

---

from receiving compensation different from that provided in their tariffs; and (4) makes unlawful the use of a rate whose filing the Commission rejected.

**3.** Section 22 of the Shipping Act, 46 U.S.C. § 821, provides that any person may file with the Commission a complaint setting forth a violation of the tariff-filing requirements and authorizes the Commission to "direct the payment . . . of full reparation to the complainant for the injury caused by such violation."

**4.** Essentially, our analysis is in harmony with the May 2, 1978, initial decision of the Administrative Law Judge (ALJ), J.A. 147–54, which the FMC rejected. The ALJ had dismissed

FIDCO's complaint for lack of jurisdiction because FIDCO had not "proved by a preponderance of the evidence that [SOS] is a common carrier by water as that term is used in section 1 of the Shipping Act." J.A. 152; *see id.* at 154.

**5.** Our conclusion on the threshold issue, that the evidence presented to the ALJ does not permit typing SOS a common carrier, renders it unnecessary for us to address the Commission's divided decision on the measurement of reparation consonant with section 22 of the Shipping Act, 46 U.S.C. § 821.

the course of SOS's efforts to move the pipe, a port congestion surcharge was dropped and SOS paid a total of $69,616.67 for the transportation, $53,484.71 less than the amount it collected from FIDCO. FIDCO requested a share in SOS's gain. Unable to negotiate a partial refund from SOS, FIDCO sought relief from the Commission in the form of a reparation award. FIDCO contended that SOS was a common carrier and, as such, should be held accountable for failing to file a tariff covering the pipe shipment.

Apart from the arrangement SOS made for the shipment of FIDCO's steel pipe, the record is devoid of evidence that SOS ever assumed responsibility for the safe transportation of ocean shipments or arranged for the performance of such transportation in its own name. Nor is there any evidence that SOS ever advertised its services as a carrier or vessel-finder. The record does show that SOS engages in brokerage business, and in contract lighterage in the Middle and Near East. J.A. 79–80.[6] It further indicates, as earlier noted, that Ragan, on behalf of cargo interests, referred vessel-locating business to SOS from time to time. J.A. 53, 57–58.

The ALJ dismissed FIDCO's complaint for lack of subject matter jurisdiction on the ground that FIDCO failed to prove SOS is a common carrier by water subject to the Shipping Act.[7] He reasoned that evidence of a single occasion on which SOS arranged for performance of transportation in its own name was inadequate to establish "the

distinctive character of a common carrier, to carry for all people indifferently." J.A. 153.

## II.

Reappraising the evidence the ALJ found insufficient to warrant ascription of common carrier status to SOS, the FMC determined that SOS ranked as a "nonvessel operating common carrier" (NVOCC). As defined in Commission decisions[8] and regulation,[9] an NVOCC is

a person who holds himself out by the establishment and maintenance of tariffs, by advertisement and solicitation, and otherwise, to provide transportation for hire by water in interstate or foreign commerce as defined in the Shipping Act, 1916; assumes responsibility or has liability imposed by law for the safe water transportation of the shipments and arranges in his own name with underlying water carriers for the performance of such transportation.

SOS, on the other hand, maintains that it operates as a broker, "one who negotiates between shipper and carrier for the purchase, sale, condition and terms of transportation."[10] SOS acknowledges that, in arranging for FIDCO's pipe shipment, SOS in fact arranged for the transportation in its own name and assumed responsibility for safe delivery of the pipe to its destination. But SOS stresses the singularity of the venture, and the special exigencies accounting for its participation in a transaction

6. A lighter is a boat or barge used within a port to load or unload ships not lying at wharves or in transporting freight around a harbor. *See* Webster's Third New International Dictionary 1308 (1976).

7. Generally, in proceedings before the Commission, the proponent of a rule or order carries the burden of proof. 46 C.F.R. § 502.155.

8. Determination of Common Carrier Status, 6 F.M.B. 245, 256–57 (1961), *cited in Pacific Coast European Conference v. Southern Pac. Marine Transport, Inc.,* 20 F.M.C. 166, 168 (1977); Possible Violations of Section 18(a) of the Shipping Act, 1916, 19 F.M.C. 44, 56 (1975).

9. 46 C.F.R. § 510.21(d).

10. *See* 46 C.F.R. § 510.21(f) (defining the term "ocean freight broker"). The FMC notes that its definition covers only brokers engaged by a carrier, so that SOS's relationship with FIDCO does not fit the description. 21 F.M.C. at 903 n.14. The Commission does not maintain, however, that brokerage work is one-sided. *Cf.* J.A. 58, 72–73 (Charles Ragan testimony as to brokers representing cargo and brokers representing vessel owners).

deviating from its normal course of business.[11]

As previously stated, the record contains no evidence demonstrating that, at any time prior to or after the FIDCO shipment, SOS arranged for ocean transportation in its own name and bore responsibility for the safe water transportation of shipments. Nor does the FMC contend that, on any occasion other than the FIDCO episode, SOS, in offering transportation services, acted as a common carrier.[12] There is therefore a "fatal gap" in the FMC's reasoning, SOS urges. We agree.

The Commission dismissed as "irrelevant" the ALJ's observations and SOS's argument that, so far as the record indicated, the service SOS rendered FIDCO "was performed on a single occasion and was a 'single shot'." [13] SOS "is in the shipping business," it "admittedly handles shipments for various customers," the FMC stated.[14]

That was enough, from the Commission's perspective, to place SOS in common carrier status. *But cf. New York Marine Co. v. Buffalo Barge Towing Corp.,* 2 U.S.M.C. 216, 219 (1939) (conducting business with a considerable number of cargo owners shipping a variety of cargo is not sufficient in itself to establish common carrier status). But "the shipping business" SOS indeed was in, and the business steered to it by Ragan prior to the FIDCO incident, was not shown to be anything but lighterage and brokerage business. The Commission has not called to our attention any administrative or judicial decision in which a "single shot" service was tacked to a pattern of activity "in the shipping business" in a non-common-carrier capacity to yield a determination that an enterprise was subject to regulation as a common carrier.[15]

■ The parties agree that the Shipping Act does not precisely define the term

---

**11.** See p. 307 *supra.*

**12.** At oral argument, counsel for the Commission acknowledged that there is no indication in the record that SOS had previously engaged in an undertaking of the type involved in the shipment of FIDCO's pipe. In response to the court's inquiry whether payments SOS made to Ragan were "for steering brokerage business to SOS," counsel further stated: "That appears to be what it was in the past."

Although lighterage, which is a prominent part of SOS's business, may be part of the performance of common carriage, *see Isthmian S.S. Co. v. California Spray-Chem. Corp.,* 300 F.2d 41, 46–47 (9th Cir. 1962), the Commission has held that its jurisdiction does not extend to "those who perform the separate and distinct service of lighterage for or on behalf of common carriers or in connection with common carriers." Rates Between Places in Alaska, 3 U.S.M.C. 7, 9 (1947). The FMC has not suggested that SOS's performance of lighterage, which apparently occurs in ports outside the United States, subjects it to the Commission's authority.

**13.** 21 F.M.C. at 902 n.12.

**14.** *Id.*

**15.** The cases characterizing entities as common carriers rely on a course of conduct rather than on a transportation service shown to have occurred only once. *E.g., Capitol Transp., Inc. v. United States,* 612 F.2d 1312, 1317–19 (1st cir. 1979) (Puerto Rican corporation moving household goods between Puerto Rico and other parts of the world); Possible Violations, *supra* note 8, 19 F.M.C. at 53 (freight consolidator providing transportation service for an "indefinite multitude of shippers"); *Puget Sound Tug & Barge Co. v. Foss Launch & Tug. Co.,* 7 F.M.C. 43 (1962) (carrier arranges regular sailings between Alaska and Washington); Determination of Common Carrier Status, *supra* note 8 (household goods moving companies); Transportation-United States Pac. Coast & Hawaii, 3 U.S.M.C. 190 (1950) (carrier undertook numerous voyages between Hawaii and the West Coast). Indeed, "[t]he most frequently mentioned characteristic is that a common carrier by a *course of conduct* holds himself out to accept goods from whomever offered to the extent of his ability to carry." Tariff Filing Practices, 9 F.M.C. 56, 62 (1965) (emphasis added; citation and footnote omitted).

Counsel for the Commission confirmed at oral argument that the FMC had cited no decision in which common carrier status was predicated upon linking to a course of conduct not as a common carrier a single incident such as the one involved in this case. We have noted before, *see Baton Rouge Marine Contractors, Inc. v. FMC,* 655 F.2d 1210, 1217 n.23 (D.C.Cir. 1981), when an agency announces an unprecedented decision, it is obliged to present a forthright explanation of the reasons for its determination. "Furthermore, the reasons contained in the explanation must be consistent with law and supported by substantial evidence on the record." *Baltimore & A. R. R. v. Washington Metropolitan Area Transit Comm'n,* 642 F.2d 1365, 1370 (D.C.Cir.1980).

"common carrier" and, further, that the legislative history of the Act suggests the entity subject to regulation is "what was deemed to be a common carrier at common law."[16] The FMC itself points out that the common carrier at common law is established by the "course of business" pursued.[17] We cannot extract from the record in this case support for a finding that SOS pursued, or was seeking to pursue, a "course of business" as a common carrier by water.[18] In the absence of evidence that SOS had embarked on a "course of business" that would warrant describing it as a common carrier, we are unable to conclude that the Commission acted in accordance with law. An extraordinary, "single shot" undertaking, we hold, does not automatically convert an enterprise engaged in any aspect of "the shipping business" into a common carrier accountable for tariff filing under the Shipping Act.

The petition to review is accordingly granted and the Commission's orders challenged by petitioner are set aside.

*It is so ordered.*

**16.** FMC Br. at 12; *see* SOS Br. at 14.

**17.** 21 F.M.C. at 901.

**18.** *See* note 15 *supra.*