## Panama Canal Company, Appellant, *v.* Stockard & Company, Appellant.

Argued November 13, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*F. Hastings Griffin, Jr.,* with him *Barnes, Dechert, Price, Myers & Rhoads,* for plaintiff.

*Benjamin F. Stahl, Jr.* with him *James F. Young* and *Clark, Ladner, Fortenbaugh & Young,* for defendants.

OPINION BY MR. JUSTICE COHEN, January 16, 1958:

Plaintiff, a shipping company, instituted an action in assumpsit in the Court of Common Pleas No. 6 of Philadelphia to recover damages from defendants for the alleged failure of a terminal operator, Mobile Service Corporation, properly to care for and deliver to the consignees entitled to receive them, all items of cargo discharged onto Mobile's pier during the course of an unscheduled call by one of plaintiff's ships at the Port of Philadelphia in March of 1954. The

case was tried without a jury, and the court found for the plaintiff in the amount of $10,053.13, the sum of amounts paid by plaintiff to the consignees for the shortages with interest from the date of payment. The defendants have appealed on the following grounds:

(1) The evidence is legally insufficient to support the court's finding that the missing cargo in question—four rubber tires and seventy-five bags of coffee—were loaded on board plaintiff's vessel and discharged therefrom onto Mobile's pier; (2) Even if this cargo were received by Mobile, defendants are not liable for its loss because provisions in the covering bills of lading precluded recovery by the consignees for this loss. Plaintiff has filed a cross-appeal from the amount of the judgment recovered, and contends that it is entitled to recover the market value of the goods as of the date upon which they should have been delivered rather than the amounts it paid to satisfy claims for shortages.

From the opinion of the court below, the undisputed facts are as follows: "Plaintiff operates cargo vessels between the ports of Cristobal and New York, with stops each way at Port au Prince, Haiti. Because of a strike condition in the port of New York which began March 5, 1954, plaintiff was temporarily prevented from using its own pier facilities to receive the inbound cargo of its vessel, the SS *Panama,* and to load her outbound. On the day the strike began plaintiff made arrangements to have the *Panama* call at Philadelphia, the nearest available port. Defendant, Stockard & Company, Inc., which had offices in Philadelphia, undertook to act as the vessel's agent while in Philadelphia. Stockard arranged to have its wholly owned subsidiary, Mobile Service Corporation, which operated Pier 5, North Wharves, at that time, act as terminal operator for the *Panama.* Defendant,

Stockard Shipping & Terminal Company, is the successor by merger to Mobile Service Corporation.

"The *Panama* arrived at Port au Prince on March 8, 1954. It was loaded outbound and departed the same day. The *Panama* arrived at Pier 5, Philadelphia, on Friday, March 12, 1954, and began discharging cargo on the following Monday. It was loaded outbound and departed on Friday, March 19, 1954. Sometime between April 21, 1954 and May 4, 1954 Mobile sent plaintiff a "turnover" report disclosing the dates upon which it made deliveries of the *Panama's* cargo. Consignees under five of the bills of lading, all issued for carriage from Port au Prince to New York, received less cargo than called for by their bills. These shortages totaled four rubber tires and seventy-five bags of coffee.

"According to the record, shipping companies which do not have offices in a port customarily appoint an agent to handle their vessels' business. The agent takes care of such matters as clearing customs and immigration, ordering pilots and tug boats, and making arrangements for berthing and the handling of cargo. With respect to handling cargo, stevedores physically unload the vessel and a terminal operator takes charge of the cargo when it is placed on the pier. Customarily terminal operators supply checkers who count the cargo and sort it by mark as it is being discharged onto the pier. The terminal operator is in charge of placing the cargo at proper points on the pier, caring for it and making proper delivery of it to the consignees.

"[However,] *Panama's* cargo was not counted by Mobile's checkers as it was discharged, and Mobile issued no receipt to plaintiff."

## Proof of Delivery

Defendants' first contention on this appeal is that plaintiff failed to prove delivery of the cargo in question to Mobile. We agree with the court below that plaintiff proved delivery of the seventy-five bags of coffee and four tires by showing that the entire cargo involved was loaded at Port au Prince, that no event during the voyage affected this cargo, and that it was unloaded in its entirety onto Mobile's pier in Philadelphia. As evidence that all the cargo was loaded at Port au Prince, the plaintiff proved that the course of its business in Port au Prince is such that any shortages in the loading of cargo would have been reflected in various business documents, but that no such error appeared. From the opinion of the learned trial judge we quote his description of these documents and their preparation.

"At [Port au Prince] . . . shippers deliver their goods to the dock and notify the steamship office what they are shipping. The goods are checked, weighed and inspected by customs officials. They are taken to the side of the ship and checked aboard by ship's checkers and by the wharf's checkers. The checkers inform the ship's chief officer how many items are checked aboard, where they have been put on board ship, and whether any exceptions are taken as to the condition of the cargo. The chief officer, who supervises the loading operation, signs an Over, Short & Damage Report (O. S. & D. Report) made from the checkers' inspection, and prepares the stowage plan. In the meantime bills of lading are prepared in the steamship office from the information received there from the shippers. The office is informed by the checkers what goods have been loaded and any exceptions are noted on the bills. If there are no exceptions the bills are stamped 'all cargo on board.'

"In this case the bills show no exceptions, and there are no discrepancies between the amounts the shippers said they were shipping and the amounts actually loaded. All bills were duly stamped 'all cargo on board.' There was one shipment of tires. The bill of lading called for sixty. The O. S. & D. Report showed sixty 'checked complete.' The stowage plan showed that sixty were loaded in hold #7T/D ('tween decks). In addition to the coffee bills of lading involved directly in this case, which called for 604 bags in all, shippers also informed the office that they were shipping an additional 285 bags of coffee. Hence the total billed was 889 bags. The O. S. & D. Report shows 889 bags 'checked complete' . . . . The stowage plan shows that 689 bags were loaded in #2 hold and 200 bags in #3B hold. No document contains any exception."

We believe the court below was warranted in finding from the documents introduced that the missing cargo was loaded aboard the *Panama*.

The Uniform Business Records as Evidence Act, Act of May 4, 1939, P. L. 42, 28 P.S. §§91a-91d (Supp), declares: "A record of an act . . . shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, . . . and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." It is conceded that the three separate documents introduced to establish the loading of the missing cargo at Port au Prince, (the Bill of Lading, the O. S. & D. Report, and the Stowage Plan), met the first two requirements of the act. The identity and mode of preparation of each document were established by the regular custodian thereof, and

each record was compiled in the regular course of business of the carrier at the time of or immediately subsequent to the loading of the cargo aboard the vessel. However, the defendants contend that the sources of information and method of preparation of these documents did not justify their admission. They argue that the O. S. & D. Report, and the Bill of Lading and the Stowage Plan made up therefrom, embody inadmissible hearsay and are entitled to no probative weight. In support of their position they point out that the O. S. & D. Report was made up by the head checker from unidentified sources and "second-hand" information, and therefore it does not show that the head checker whose recitals are contained therein had personal knowledge of the loading. Thus the defendants contend (1) that the individual checkers' slips, which these records summarize, should have been introduced into evidence, and (2) that the admission of these records unfairly deprived them of an opportunity to cross-examine the checkers who actually counted the goods and made the entries. We think these arguments lack merit. No objection was made to the admission of the documents at the trial, and plaintiff was entitled to assume that it would not be necessary to introduce the records of the individual checkers or to produce corroborating testimony from the checkers themselves. More important, ". . . the . . . [checkers] have in many cases changed and the former ones' cannot be found; in the next place, it cannot always be ascertained accurately which . . . [checker] was concerned in each one of the transactions represented by the hundreds of entries; in the third place, even if they could be ascertained, the production of the scores of . . . [checkers], to attend court and identify in tedious succession the detailed items of transactions would interrupt and derange the work of the . . . [car-

rier], and the evidence would be obtained at a cost practically prohibitory; and finally, the memory of such persons, when summoned, would usually afford little real aid." 5 Wigmore, Evidence §1530 at 378 (3rd ed. 1940) ; Cf. *Freedman v. Mutual Life Insurance Co. of N. Y.*, 342 Pa. 404, 21 A. 2d 81 (1941). Involved as the checkers are in day-to-day loading of scores of ships, it would be highly improbable that they would be able to recall from actual memory any of the data recorded. For the foregoing reasons we hold that the court below did not abuse its discretion in admitting these documents in evidence. See 5 Wigmore, op. cit. supra, §§1520, 1530a.

## Mobile's Liability For Loss

The defendants admit, for purposes of this appeal, that Mobile having been paid to safeguard and deliver the goods, was bound to exercise at least ordinary care in the undertaking. After proof of the delivery of the goods to Mobile and the failure by Mobile to redeliver them, defendants had the duty to come forward with evidence to show how the goods were lost and that the loss was not the result of Mobile's negligence. Since defendants failed to introduce such evidence their liability has been made out. However, they contend that they may assert the "limitation on liability" provisions contained in the bills of lading under which the missing cargo was shipped as a complete defense to their liability for any loss.

The Panama's bills of lading contain the following clauses:

"15. The carrier's liability for loss and damage shall be restricted to the actual pecuniary loss or damage sustained . . . but in no case shall such compensation exceed the market price at destination on day

of arrival . . . *and the maximum sum to be paid . . . in respect of any package . . . shall be $100, Except in the case of a package or piece declared in writing at time of shipment, as exceeding $100 in value,* the full value . . . being also stated . . . and extra freight ad valorem, being paid . . . in accordance with the carrier's tariffs for goods of special value. . . .

"17. Claims for loss or damage shall be presented to the carrier in writing *within sixty days after the shipment concerned arrives or should arrive at destination.* Any claim not so presented . . . shall be considered waived. . . . No suit for loss or damage shall be maintainable against the carrier unless instituted *within six months after the shipment concerned arrives or should arrive at destination.*" (Emphasis supplied).

If the bills of lading were in effect after the goods were landed on Mobile's pier then, so the defendants' argument runs, Mobile as the agent for the carrier was entitled to the benefit of the above-quoted restrictive provisions, and since the owners' claims were barred by the terms of these provisions at the time when the plaintiff paid them, the plaintiff cannot recover indemnity for such payments.

We need not consider the effect of these clauses under the relevant federal statutes, (Carriage of Goods by Sea Act, 49 Stat. 1207 (1936), 46 U.S.C.A. §§1300-1315; Harter Act, 27 Stat. 445 (1893), 46 U.S.C.A. §§190-195), because of paragraph 22 contained in the bills of lading.

"22. In the event of the steamer being prevented by . . . some . . . cause beyond the carrier's control, from reaching the port of delivery, then the carrier shall have the right and option of . . . *landing the goods at the nearest available port, such . . . landing to be considered a full and proper accomplishment of his contract,* and all additional expenses so incurred shall

be paid by the consignee or receiver of the shipment."
(Emphasis supplied).

Both parties concede that the strike in progress at
the New York Port was a justification for the depar-
ture from the contract of carriage, and for the call
made at Philadelphia to discharge cargo. See *Accin-
anto Ltd. v. Cosmopolitan Shipping Co.,* 99 F. Supp.
261 (D. C. Md. 1951), aff'd, 199 F. 2d 134 (4th cir.
1952). However, as the defendants point out, "[u]n-
til receipt by the consignee, the carrier, despite any
terms to the contrary in its bill of lading, continues
to hold goods unloaded by it as a bailee." ". . . and,
as such, it is bound to exercise ordinary care in the
protection of the goods." *Standard Brands, Inc. v.
Nippon Yusen Kaisha,* 42 F. Supp. 43, 44 (D. C. Mass.
1941). For this reason defendants argue that the
"landing" referred to in the bills of lading must in-
clude the loading, necessary storage, and delivery of
the goods to the forwarding carrier, and that there-
fore, the bills were still in effect at the time the loss
of the goods occurred. Apparently defendants over-
look the fact that a contract of carriage (bill of lad-
ing) may or may not apply to all facets of the car-
rier's duty towards the owners of its cargo. *The Bel-
lingham,* 49 F. 2d 442 (D. C. N. J. 1931), rev'd on other
grounds, 57 F. 2d 1015 (3rd cir. 1932); *Federal In-
surance Co. v. American Export Lines,* 113 F. Supp.
540 (S. D. N. Y. 1953). Whether it does apply in any
given situation depends upon the wording of the in-
dividual contract. In the present case the parties pro-
vided that the "landing" of the goods was to be con-
sidered an "accomplishment" of the contract of car-
riage. Giving the word "landing" its ordinary mean-
ing, and applying that meaning to the context of the
carriage contract, we believe that the term refers to
the physical placing of the cargo upon Mobile's pier.

Certainly, "landing" would not mean "to act as a warehouseman," or "to hold", and "to deliver" as the defendants suggest that it should. The defendants introduced no evidence to show that by usage, convention of the trade, or under the surrounding circumstances that "landing" had a meaning different from its ordinary meaning. In effect, the defendants attempt to create an ambiguity where no ambiguity exists, and under this guise, vary the plain meaning of clause 22. This they may not do. See 3 Williston, Contracts 1750 n.10 (rev. ed. 1936) ; Anstead v. Cook, 291 Pa. 335, 140 Atl. 139 (1927).

We hold, therefore, that although the termination of the contract did not relieve the carrier of its common law duties as bailee to deliver the goods to the consignees, its contractual duties under the bills had ceased. Defenses created by these bills, which would have been effective had the cargo loss occurred during the voyage, were no longer available to Mobile after the landing of the cargo. See The Bellingham, supra; Federal Insurance Co. v. American Export Lines, supra.

### Damages

Plaintiff in the court below and on appeal argued this case on the theory of a simple bailment,[1] and contends that as the bailee it is entitled to recover the market value of the lost goods as of April 21, 1954, the date by which the goods should have been turned over to the consignees.

It is well-settled that a bailee may recover to the extent of his special interest for the loss of a chattel occasioned by a third person. Engel v. Scott & Hollis-

---

[1] Technically, the carrier stands in the relationship of bailor to Mobile who is the bailee in possession. But in relation to the owner, Panama is the bailee and Mobile the sub-bailee of the cargo.

*ter Lumber Co.,* 60 Minn. 39, 61 N.W. 825 (1895); *Sherman v. Matthews,* 15 Gray (Mass.) 508 (1860). Since the leading case of *The Winkfield,* [1902] P. 42 (C.A.), it has also been said that the bailee may recover the full value of the lost chattel, holding in trust for the bailor the amount of any recovery beyond his own interest. *E.g. Rosenfeld v. Continental Building Operating Co.,* 135 F. Supp. 465, 467, (D. C. W. D. Mo. 1955). But this rule should apply only to cases where the bailee, either expressly or by reasonable implication from the circumstances of the case, has the consent of the bailor to bring the action. Brown, Personal Property 397 (2nd ed. 1955); Prosser, Torts 68 (2nd ed. 1955); Warren, Qualifying as Plaintiff in an Action for a Conversion, 49 Harv. L. Rev. 1084, (1096-98) (1936); Cf. *Gardner v. Freystown Mutual Fire Insurance Co.,* 350 Pa. 1, 37 A. 2d 535 (1944). (Bailee agreeing to insure goods for bailor may recover full amount of policy). Otherwise, since a recovery for full value by a bailee prevents a subsequent action by the bailor, *Gardner v. Freystown Mutual Fire Insurance Co.,* supra, if the bailee mishandles the suit as by obtaining an inadequate recovery, or dissipates the proceeds, the bailor suffers needless loss.

As a carrier plaintiff had no special interest in its cargo, and it failed to show that the present action was brought with the consent of the owners thereof. For these reasons the court below correctly held the plaintiff was entitled only to indemnity—$10,053.13—which represents the sum of the amounts plaintiff paid to the owners of the lost goods based upon the invoice prices of the goods with interest from the date each claim was paid.

Judgment affirmed.