**Commonwealth Financial Systems v. Smith**

2

C.P. of Delaware County, no. 06-53273.

*Edwin M. Matzkin,* for plaintiff.
*Lawrence S. Rubin,* for defendant.

BURR, *J.,* January 26, 2010—The plaintiff, Commonwealth Financial Systems, has appealed from the

order of this court denying the plaintiff's motion for post-trial relief in this action to collect a credit card debt allegedly due and owing by the defendant, Larry Smith. The plaintiff asserted error in the sort of evidentiary rulings that have become a growing subject in recent case law involving the collection efforts of second and third party purchasers of bundles of credit card debts against the customers of the original lenders. The issuer of the credit card at the core of this action was Citibank. In this case of apparent first impression, plaintiff failed to satisfy the requirements for the admissibility of business records under Pa.R.E. 803(6), and particularly the requirement that a business record be created "by, or from information transmitted by, a person with knowledge . . . ." Therefore, the chain of evidence presented did not adequately authenticate the computerized business records necessary to establish their trustworthiness and reliability sufficient to permit their admission into evidence.

The plaintiff also failed to present to the court a signed credit card application or an original contractual agreement between Citibank and the defendant; instead, the agreement proffered by the plaintiff post-dated the contract alleged to have been entered into by the defendant by seven years. This failure of the plaintiff to establish even the first element of its action for breach of contract against the defendant is equally fatal to any and all claims raised in this appeal.

The above-captioned matter was assigned to this court on plaintiff's appeal from a finding in favor of the defendant on December 23, 2008 by a panel of arbitrators.

4

The complaint filed by the plaintiff alleged that plaintiff's predecessor, Citibank, had issued the defendant a revolving credit card under account number \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* on or about November of 1989, and that the defendant had defaulted on her payments to Citibank both sometime in January of 2002 and on February 7, 2002.[1] (Complaint, paragraphs 5 and 4, respectively.) The plaintiff appended, as "exhibit A" to its complaint, two monthly billing statements from that time period, but no listing or description of expenditures over the long term on which this debt was purportedly based. The first of these

1. These averments indicate a maddening inexactitude in an inartfully constructed complaint. In the complaint, plaintiff alleged a contracting date for defendant with Citibank of 1989, but at the trial of this case that took place on July 16, 2009, plaintiff's counsel stated, apparently for the first and only time, that the defendant got the Citibank credit card in "1999." (Complaint, ¶3; 7/16/09 N.T. 20.) Nevertheless, an affidavit appended as "exhibit E" to the complaint and the plaintiff's own trial witness, Daniel Venditti, testifying about a document listing the particulars surrounding the within debt, gave the date of the opening of this account as "November 1, *1989.*" (N.T. 44.) (emphasis added) Lastly, apparently realizing the mistake, plaintiff asserted in argument supporting its post-trial motion that the date of this contract was in November of 1989. (Plaintiff's memorandum of law and subsequently filed brief in support of motion for post-trial relief, pp. 1, respectively.) Plaintiff has yet to explain or elucidate how and why it concluded that it was acceptable to pursue a claim in our courts based on a contract the plaintiff neither saw nor signed.

Plaintiff's unfocused presentation of this matter to this court took an even odder turn with an averment in the memorandum in support of its post-trial motion filed July 30, 2009, that Citibank had sold the defendant's debt to "Unifund CCR Partners", a debt purchasing entity that purportedly then sold the debt to the plaintiff. (*Id.,* p. 2.) Here again, having realized the mistake, the name of the first purchaser of this debt was changed to NCOP Capital Inc. in the above-mentioned subsequently filed brief in support of plaintiff's post-trial motion filed October 9. 2009. (*Id.,* p. 2.)

statements was issued to the defendant on February 25, 2002 and reflected receipt of a last payment posted by Citibank on February 7, 2002. (N.T. 24, 29-31; trial exhibit P-2.) That billing statement asserted that defendant's next payment of $44 on a balance of $2,157.01 was due as of March 20, 2002. The second billing statement appended to the complaint was issued to the defendant on March 26, 2002 and reflected a late fee of $35 on a past due payment that had not yet been received. (N.T. 32, 36-37; trial exhibit P-2.)

A thorough perusal of the relevant exhibits appended to the complaint, which was filed on March 7, 2006, adduces that, if defendant's default could be dated from March 20, 2002, the complaint had been filed within the applicable four-year statute of limitations for a cause of action alleging breach of contract. 42 Pa.C.S. §5525(a).[2] Nevertheless, inartful and inconsistent pleadings by the plaintiff created unnecessary tensions in resolving the question as to when the defendant's alleged default on this account had actually taken place, whether in January of 2002 or February 7, 2002, as alleged in the complaint,

2. The defendant moved for dismissal of this case at the beginning of the trial on grounds that plaintiff's suit was filed outside of the applicable statute of limitations. (N.T. 11-12.) That motion was denied. (N.T. 11.) The defendant's claim that plaintiff had failed to timely sue rested on the above-stated internally inconsistent averments in paragraph 4 of the complaint that defendant's default occurred "on February 7, 2002" and in paragraph 5 thereof that plaintiff's default had occurred following a "last payment during January of 2002." However, again, the exhibits appended to the complaint suggested the time of default as occurring when the defendant failed to remit a demanded payment on March 20, 2002 following a payment posted as having been received on February 7, 2002. (Complaint, ¶¶ 4 and 5; N.T. 37, 58-59.)

or by the failure to make a payment by March 20, 2002, or on March 26, 2002 when Citibank charged defendant a late fee for missing that payment according to the exhibits appended to the complaint.[3]

The plaintiff appended, as "exhibit B" to its complaint, a standard form copy of a 1996 "Citibank card agreement", formulated nearly seven years following the initiation of the defendant's Citibank credit card account and showing no signature of the defendant. This document reflects an identification number of "********/ *******", a number bearing no relationship to the account number at issue, plus the dates: "Rev. 9/96 Pr. 7/97" reflecting the dates of the agreement's revisions. (N.T. 17; trial exhibit P-1.) The allegation of 23.99 percent interest per annum alleged to be due and owing by the defendant in paragraphs 6 and 9 of the complaint, on an account that had been originated in 1989, is clouded by the 1996 card agreement's statement that its per annum interest percentage would be raised from 12.9 percent to an amount "not . . . lower than 19.8 percent" in the event of default in payments on the account, and not the 23.99 percent therefor that was alleged in the complaint. (N.T. 65.) This latter figure is said to include the extant prime interest rate as of the year 1996 or 1997, a rate that would surely differ from that in existence in 1989.

---

3. When the issue was revisited at the close of the trial with the court noting that the inconsistencies in allegations of the date of default posed a conundrum that still needed to be resolved, plaintiff's counsel admitted that pleadings contradictory to a default date of March 20, 2002 had been entered in error by himself and mistakenly verified by an officer of the plaintiff company. (N.T. 88-98.) The defendant has filed no cross-appeal to again raise a statute of limitations defense to this action.

Statements in this document also leave open the questions as to whether or not the defendant had been allowed a variable annual rate of interest on the account in addition to the actual escalated rate of interest that could be charged upon default, besides the *quantum* of attorney fees that assertedly could be recovered in that event.[4] Citibank's billing notices to the defendant stated a 12.150 percent "annual percentage rate" of interest owing on standard purchases in the amount of $1,767.64 and 2.900 percent on "Balance 1" purchases in the amount of $398.03, plus "periodic rates" of interest on both groups of purchases respectively of 0.03329 percent and 0.00795 percent as of February 25, 2002 and March 26, 2002. It is here noted that the defendant apparently did not use the card for cash advances prior to the relevant time, as none appear as due and owing on either of the proffered billing statements. And clearly, any rates of interest reflected in a 1996 standard form unsigned Citibank card agreement cannot be alleged as being in effect for a Citibank credit card issued to the defendant in 1989.

The plaintiff appended, as "exhibit C" to the complaint, a "bill of sale, assignment and assumption agreement" dated July 14, 2004 between Citibank and NCOP Capital Inc., wherein Citibank, as seller, conveyed to NCOP Capital Inc. and to its successors and assigns "the ac-

---

4. This is another instance of inconsistency in plaintiff's pleadings. Plaintiff asserted in the complaint that "20 percent attorney fees" plus costs were warranted in this action to collect upon the defendant's debt, an amount that later became "reasonable attorney fees" after plaintiff's counsel apparently determined that no such percentage rate for attorney fees appeared—even in the 1996 Citibank card agreement. (complaint, ab damnum clauses for Counts I and II; Citibank card agreement, appended as "exhibit B" to the complaint and trial exhibit P-1.)

counts described in section 1.2 of the agreement." (N.T. 38; trial exhibit P-3.) Section 1.2 was not attached to the plaintiff's complaint, but was presented and discussed during the trial, albeit not for purposes of admission as an exhibit. (N.T. 41-45.) Citibank's signatory on this "bill of sale" was its CFO, Douglas C. Morrison, and NCOP's signatory was Michael B. Meringolo, as senior vice-president of that company.

The plaintiff appended, as "exhibit D" to the complaint, a "bill of sale, assignment and assumption agreement" dated July 19, 2004 between NCOP Capital Inc. and the plaintiff, Commonwealth Financial Systems Inc., wherein NCOP, as seller, conveyed to the plaintiff and to its successors and assigns "the accounts described in section 1.2 of the agreement." (N.T. 40; trial exhibit P-4.) Here again, section 1.2 was not attached to the plaintiff's complaint, but was presented and discussed at trial, albeit not for purposes of admission as an exhibit. (N.T. 41-45.) The plaintiff's signatory on this "bill of sale, assignment and purchase agreement" was its president, John Kotula, and NCOP's signatory was, again, Michael B. Meringolo, as senior vice-president of that company.

The plaintiff appended, as "exhibit E" to the complaint, the following notarized affidavit of one Michael Chiodo, of "NCO Portfolio Management Inc.; its subsidiaries and affiliates", signed on September 24, 2004, and referencing the foregoing Citibank account number of the defendant, Larry Smith, and Smith's Social Security number in the heading:

"Michael Chiodo, being sworn, deposes and says that the affiant making this affidavit is an employee of NCO

Portfolio Management Inc.; it's [sic] subsidiaries and affiliates, (the company), which is located at 507 Prudential Road, Horsham, PA 19044. The affiant is authorized to make the statements and representations herein. The company's business records show that as of July 19, 2004, there was due and payable from account no. *************** the amount of $2,780.04. The company's business records show that this account was opened on 11/1/89. The affiant states that to the best of affiant's knowledge, information and belief there are no uncredited payments against said debt."

The court here notes that Mr. Chiodo's testimony was not presented at the trial of this case on July 16, 2009.

Plaintiff pleaded the amount of $5,435.93, plus interest at 23.99 percent per annum commencing on the file date of the complaint on March 7, 2006, plus attorney fees at a rate of 20 percent (now "reasonable" attorney fees) and costs in Count I thereof, arising from the defendant's alleged breach of Citibank's card agreement, and these same damages in a Count II alleging quantum meruit or quasi contract. (N.T. 49; trial exhibit P-6, available in the record.) At the trial, the plaintiff presented, as its only witness, its vice-president, Daniel Venditti, who said he was responsible for overseeing the company's portfolio collection division. (N.T. 13, 15.) Mr. Venditti indicated that the plaintiff's sole business is debt purchasing and debt collection; that he became involved with debt buyers who purchase accounts from Citibank in 2001; and that he had never been directly employed by Citibank or any other issuer of credit cards. (N.T. 14, 21-22, 34-36.) This witness said that, in a debt purchas-

ing arrangement, the records of the seller become those of the buyer and that the documents associated with particular accounts were provided to the plaintiff electronically in a form known in the jargon of the industry as "media" by NCOP Capital Inc., the first broker that had purchased the bundle of Citibank credit card debts in which the defendant's was included. (N.T. 23, 26-29, 38-39.)

Referring to the "bills of sale and assignment and assumption" agreements appended to the plaintiff's complaint as exhibits C and D, respectively, Mr. Venditti said that NCOP Capital Inc. purchased the spread of accounts, which, according to the witness, could be 10 accounts or 5,000 accounts, from Citibank and that the plaintiff had, in turn, purchased that spread of accounts that included the defendant's from NCOP Capital Inc. (N.T. 38-41; trial exhibits P-3 and P-4.)[5] Mr. Venditti went on to discuss the "debt spread" for the within bundle of accounts that apparently comprised the "section 1.2" referenced in the foregoing "bills of sale and assignment and assumption" agreements. (N.T. 41-45; trial exhibit P-4.) Information regarding the defendant that was set

5. Although the Chiodo affidavit appended as "exhibit E" to the complaint refers to NCOP as "NCO Portfolio Management Inc.", plaintiff's counsel and Mr. Venditti consistently employed the nomenclature of "NCO Capital Inc." seen in the "bills of sale, assignment and assumption agreements" that operated to transfer the bundles of Citibank's credit card debts from one broker and then to the plaintiff. Plaintiff's consistent inexactitude in litigating this action has left open the question as to whether NCO Capital Inc. is a subsidiary of NCO Portfolio Management Inc., or vice versa, or whether they are separate business entities altogether.

forth in this document included the defendant's address, town, state, zip code, home and work telephone numbers, the original credit card account number, Social Security number, default interest rate, the date the account was opened (November 1, 1989), the date of the last payment, principal balance, balance with accrued interest, the date of the charge off, and the final balance due and owing, an amount reflected in the document as "$4,215.01" as of September 25, 2002. (N.T. 44-45.) The witness said that interest at a rate of 23.99 percent has continued to accrue on the defendant's account since the time of default in March of 2002. (N.T. 46-47.)

The defendant's trial counsel questioned Mr. Venditti regarding the chain of the available evidence as well as Mr. Venditti's qualifications to present that evidence. The witness again stated that Citibank had sold the defendant's account to NCOP Capital Inc., and that NCOP Capital Inc. had sold the debt to the plaintiff. (N.T. 50.) Mr. Venditti admitted that he had no knowledge as to Citibank's records and how Citibank handles those records, such as when they had this specific account. (N.T. 50.) Mr. Venditti also admitted that he possessed no such knowledge with regard to NCOP's method of record keeping or business model. (N.T. 51.) This witness stated that NCOP's business records are kept on computers, but admitted that he had no knowledge of how NCOP keeps their computers, how they back up their computers, nor intimate knowledge of the workings of NCOP's Internet Technology (IT) department, and could not say for certain whether the relevant data in NCOP's computers was protected. (N.T. 51-52.) Mr. Venditti, while emphasizing that he had no such personal knowledge, lamely offered that "NCO [sic] is SAS-70 qualified . . .

[and has, therefore,] passed a very rigorous examination of their internal technology system in order to protect their data . . . [t]hat is the extent of my knowledge." (N.T. 52-54.) When asked by the court to define SAS-70, Mr. Venditti explained that it "is a test on multiple levels and multiple fields of a computer system to ensure data integrity in all aspects; data protection, virus corruption protection and everything else." (N.T. 77.) Nevertheless, plaintiff never showed that Mr. Venditti's reliance upon a fulfillment of this requirement by Citibank and NCOP Capital Inc. was well founded and, indeed, fully justified.

The witness said that he never asked, but merely assumed, that the electronically transmitted spreadsheet for the accounts purchased from Citibank and passed on to the plaintiff by NCOP Capital Inc. was protected. (N.T. 54-55.) Mr. Venditti said he had no personal knowledge as to whether that data was inaccurate or had been corrupted at any time prior to plaintiff's receiving it, nor knowledge that the same wasn't so when Citibank transmitted the data to NCOP Capital Inc. in the first instance. (N.T. 55-56.) Moving to Mr. Venditti's qualifications to discuss the data in question, the witness answered plaintiff's counsel's questions as to whether or not he possessed personal knowledge that the entries on the alleged statements were made at or near the time of the events, and whether the data was transmitted by someone with knowledge, in the negative. (N.T. 55.)

In the matter of the last revision date of "7/97" reflected on the proffered 1996 Citibank card agreement, Mr. Venditti said that the agreements are not revised every year and that the last revision before defendant's

alleged default took place was in 1999, with the last ever revision thereof being made in 2004. (N.T. 60-61; trial exhibit P-1.) When pressed to answer whether or not the much revised Citibank card agreement in question applied to the defendant, Mr. Venditti could offer no clear response. (N.T. 61-63.) The witness, however, admitted that the agreement bears no mention of a 23.99 interest rate, and that it states only that "we may immediately increase your variable annual percentage rate, including any introductory or promotional rate on any existing purchase, cash advance, balances or higher rate of 12.9 plus the prime rate determined above [and that] [t]his higher rate will not be lower than 19.8 percent." (N.T. 63-65; trial exhibit P-1.) Mr. Venditti testified that 19.8 percent would be the minimum rate in the event of default, but that he did not know what the prime rate of interest was in 2002. (N.T. 66.) Mr. Venditti also related that the relevant section of the Citibank card agreement bears no mention of the "20 percent counsel fees" sought by the plaintiff in this action. (N.T. 66-68.)

At the close of the trial, defendant, through counsel, objected to the admission of all of the plaintiff's exhibits on grounds that they were not qualified under Pa.R.E. 803(6) inasmuch as plaintiff had not shown that they were created at or near the time of the events in question, nor transmitted by a person with knowledge, nor, indeed, that the proffered Citibank card agreement was the agreement extant at the time of defendant's assumption of this credit card account. (N.T. 81-82.) Plaintiff's counsel initially replied "yes" when the court commented:

"[D]on't you need to have a custodian or other qualified witness, which seems to me could be from Citibank

. . . or Citibank Platinum . . . to comply with 803(6), the records exception to the hearsay rule?"

The court continued:

"Because data compilation in that rule does include, according to the comments, includes records in any form and it encompasses computerized data storage. This gentleman as knowledgeable as he is with his work with Commonwealth Financial Systems, doesn't work— wasn't employed by Citi Platinum regarding this particular account it seems to me. And I question whether you have the testimony of a custodian or other qualified witnesses—witness to indicate the trustworthiness of these documents." (N.T. 82.)

Plaintiff's counsel argued in return that, in this new computer age and according to emerging case law, NCOP Capital Inc. had the right to rely upon Citibank's representations as to the accuracy of the within data, and that the plaintiff had the right to rely upon the same representations from NCOP Capital Inc. and to accept it as the output of Citibank, noting that it would be impossible for Citibank to provide a records custodian to testify in every one of the hundreds of thousands of its credit card debt collection cases like this one flooding into the nation's courts right now. (N.T. 82-86.) Plaintiff's counsel also indicated that debts such as the defendant's are written off by Citibank and sold to nothing more than debt collections agencies like the plaintiff to attempt to collect them. (N.T. 84-85.) Besides reflecting that the enormous interest rates charged by Citibank might be used by its attorneys to seek collection of these debts, the court replied, "I'm just not sure that Mr. Venditti . . . is the right person to establish the Citibank records." (N.T. 88.)

The court subsequently issued a verdict in favor of the defendant and the plaintiff's timely filed motion for post-trial relief was denied. The court appended the following footnote to the verdict noting that it was "based, inter alia, upon the inadequate authentication of computerized business records as required by Pa.R.E. 803(6)." The plaintiff has submitted the following concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b):

"(a) The court made an error of law in failing to award sanctions in favor of [plaintiff] and against defendant pursuant to Pa.R.C.P. 234.5 and Pa.R.C.P. 4019(c)(2), or order the appearance of the defendant despite her counsel having been provided with a notice to attend within a reasonable time prior to trial, once the parties were assigned a trial date and for allowing the defendant to support her defenses, by and through statements and questioning by her counsel, despite her willful disregard of the notice to attend.

"(b) The court made an error of law by denying into evidence [plaintiff's] exhibits including cardmember agreement, representative monthly statements from the original creditor, Citibank, documents supporting the chain of title from original creditor to [plaintiff] and affidavit of intermediary as to defendant's name, identification numbers and balance due as "business records" pursuant to Pa.R.E. 803(6).

"(c) The court made an error of law by denying into evidence [plaintiff's] exhibits including the cardmember agreement, representative monthly statements from [the]

original creditor, Citibank, documents supporting the chain of title from [the] original creditor to [plaintiff] and affidavit of intermediary as to defendant's name, identification numbers and balance due despite testimony of a 'witness with knowledge' pursuant to Pa.R.E. 901(b)(1).

"(d) The court made an error of law by denying into evidence [plaintiff's] exhibits including the cardmember agreement, representative monthly statements from [the] original creditor, Citibank, even though said documents are self-authenticating pursuant to Pa.R.E. 902(7), containing trademarks and inscriptions affixed by Citibank.

"(e) The court abused its discretion in denying into evidence the documents stated above without any reference to their trustworthiness or untrustworthiness pursuant to the standards established in *Fauceglia v. Harry,* [409 Pa. 155], 185 A.2d 598 (1962) and *Ganster v. Western Pennsylvania Water Co.,* [349 Pa. Super. 561], 504 A.2d 186 [(1985)]." (Plaintiff's concise statement of matters complained of on appeal, pp. 1-2.)

The plaintiff's contentions, which can be summarized as arising from the defendant's absence from the trial and the preclusion of plaintiff's trial evidence, are discussed under the appropriate headings below.

## THE DEFENDANT'S ABSENCE
## FROM THE TRIAL

The plaintiff contended error in the court's failure "to award sanctions in favor of [plaintiff] and against defen-

dant pursuant to Pa.R.C.P. 234.5[6] and Pa.R.C.P. 4019(c) (2)[7], or order the appearance of the defendant despite her counsel having been provided with a notice to attend within a reasonable time prior to trial, once the parties were assigned a trial date and for allowing the defendant to support her defenses, by and through statements and questioning by her counsel, despite her willful disregard of the notice to attend." (Concise statement, paragraph (a).) The record, however, reflects that the plaintiff's notice to attend was not timely sent and that plaintiff did

---

6. "Pa.R.C.P. 234.5. Failure to comply with subpoena. Notice to attend or notice to produce.

"(a) If a witness fails to comply with a subpoena, the court may issue a bench warrant and if the failure to comply is wilful [sic] may adjudge the witness to be in contempt. No bench warrant may be issued and no adjudication of contempt may be made for the nonappearance of a witness served by ordinary mail pursuant to Rule 234.2(b)(3) unless the witness has returned the signed form of acknowledgment prescribed by Rule 234.9 [setting forth the form 'Notice and acknowledgment of receipt of subpoena by mail'].

"(b) If a party fails to comply with a subpoena, a notice to attend or a notice to produce, the court may enter any order imposing appropriate sanctions authorized by Rule 4019(c) and, if the failure to comply is for the purpose of delay or in bad faith, the court may impose on that party the reasonable expenses actually incurred by the opposing party by reason of such delay or bad faith, including attorney's fees. If the failure is wilful [sic] the court, after hearing, may adjudge the party to be in contempt." (Pa.R.C.P. 234.5.)

7. "Pa.R.C.P. 4019. Sanctions . . .

"(c) The court, when acting under subdivision (a) [listing sanctions for violations of the discovery rules] of this rule, may make . . .

"(2) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony, or from introducing evidence of physical or mental condition[.]" Pa.R.C.P. 4019(c)(2).

not request the court to order the appearance of the defendant at the trial.

The plaintiff appended, as exhibit "A" to its motion for post-trial relief, a copy of the aforesaid "notice to attend" directing the defendant to appear for trial in this matter scheduled for July 16, 2009, and a facsimile cover sheet evincing that the said notice was sent to defendant through her counsel on July 14, 2009. (Plaintiff's motion for post-trial relief, exhibit "A".) At the commencement of the trial, the following dialogue ensued between plaintiffs and defendant's counsel and the court:

"Plaintiff's Counsel: I note that the defendant isn't here. I did file a motion [sic] to attend pursuant to Rule 234.3 and she is not here. I would therefore ask for . . . appropriate sanctions pursuant to 4019(c), that the defense will not be permitted to support or oppose any claims or defenses [and] prohibiting the party from introducing into evidence any documents, things or testimony.

"Defense Counsel: Your honor with—to respond to that, Mr. Matzkin waited until the day before trial to serve that notice. I received it yesterday. 234.2 or 4 I believe he's referring to talks about reasonable notice. Now I don't think the day before trial is reasonable notice in light of the fact that my client wasn't even there during the arbitration and he knew she wasn't there and he complained that he wasn't able to cross-examine her. Now it has been months and months and months since the arbitration. He knew that she was an elderly person. He knew that I wasn't going to bring her. And yet he

waits until the day before trial to send the notice. I was —on that day I had a hearing in bankruptcy court. How could I possibly bring in an elderly woman with medical problems and prepare her and go and do my bankruptcy hearing the day before trial? I don't think the statute thinks that's a reasonable notice. I think reasonable notice is 30 days, but even if it's not 30 days I don't think it's one day.

"The Court: Why did you wait, Mr. Matzkin?

"Plaintiff's Counsel: . . . We received—my office received a telephone call on July 10 assigning the matter for today.

"The Court: And you were—before that you knew you were on the June 22 trial list.

"Plaintiff's Counsel: We clearly were on the list. However the notice to appear, which is a prescribed form from the state, tells the person that they have to appear in such and such courthouse, such and such [c]ourtroom at such and such time.

"The Court: Well you can put [TBA] in there.

"Plaintiff's Counsel: I didn't have that information.

"The Court: Well, you knew it was going to trial. You wanted [the defendant] at trial. You could have even written Mr. Rubin a letter saying, 'Please produce your client.'

"Plaintiff's Counsel: I did.

"The Court: Let me just indicate . . . so the record and the court reporter isn't [confused] that the defendant is Larry Smith, but I understand Larry Smith is a female.

"Defendant's Counsel: Larry Smith is an elderly woman.

"The Court: Okay. So somebody isn't confused when we're referring to 'her' or 'she' that that's the defendant, Larry Smith.

"Plaintiff's Counsel: Since she did not appear at arbitration, I don't know how old she is and I have no idea of her health condition, nor do I care to be perfectly frank. I filed a notice pursuant to a rule. I believe based upon the advice of when the matter was going to trial it was timely because Mr. Rubin, in my opinion, should have known that he would have to produce his defendant, his client to appear at a trial.

"The Court: No he doesn't. It could be his trial strategy that he decides not to produce his client. If you want her there, you should file a notice. . . [reading from Pa.R.C.P. 234.3] 'The notice shall be served reasonably in advance of the date upon which attendance is required. It may also require the party to produce documents or things.'"(N.T. 4-9.)

Following additional discussion adducing that defendant's attorney did not plan to produce his client as a trial witness, the court denied plaintiff's motion for sanctions in the nature of prohibiting the defendant from supporting or opposing any claims or defenses and from introducing into evidence any documents, things or testimony on grounds that the notice to appear at the trial was untimely sent by the plaintiff to the defendant through her counsel. (N.T. 4-5, 9-11.) The court here again notes that plaintiff's counsel never asked the court to order the defendant's appearance at that proceeding.

Most crucially for the viability of this contention, however, is the fact that plaintiff's counsel raised no objection of record to the court's denial of its motion for sanctions on grounds that the notice to attend was untimely. (N.T. 10-11.) This contention, therefore, must be deemed waived. Pa.R.C.P. 227.1(b)(1); *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974).

## PRECLUSION OF PLAINTIFF'S TRIAL EVIDENCE

The plaintiff contended error in the preclusion of its five trial exhibits: P-1 (1996 Citibank card agreement (Rev. 7/97)); P-2 (four Citi Platinum Select Card billing statements purportedly sent to the defendant bearing closing dates of December 26, 2001, January 25, 2002, February 25, 2002 and March 26, 2002—with the third of these evincing a last payment received from the defendant on February 7, 2002); P-3 (bill of sale, assignment and assumption of agreement adducing a sale of the defendant's account by Citibank to NCOP Capital Inc. on July 14, 2004); P-4 (bill of sale, assignment and assumption of agreement adducing a sale of the defendant's account by NCOP Capital Inc. to the plaintiff on July 19, 2004, attached to which is a heavily redacted document without headings delineating notations on an unredacted line assertedly showing the defendant's Citibank account number, Social Security number, an unexplained rate of interest reported as "23.99 percent", a notation of "11/01/1989", presumably indicating the date of the opening of the account, a notation of "02/07/02" which could be taken as the date of a receipt of a payment listed as "$45" from the defendant, whose address, zip

code and telephone number plus notations of "$3,988.64", "$4,215.01", "09/25/2002" and "$4,215.01" that follow the defendant's telephone number); and P-5 (the signed and notarized affidavit of NCOP's representative, Michael Chiodo, stating that NCOP's business records show that the defendant opened the subject account on "11/1/89" and that, as of July 19, 2003, the sum of $2,780.04 was due and owing on the account.

The plaintiff raised a number of grounds in the following respective paragraphs of its concise statement in contending error in the preclusion of the foregoing evidence, to wit: (b) that the evidence was admissible under the business records exception to the hearsay rule set forth in Pa.R.E. 803(6);[8] (c) that Mr. Venditti's testimony regarding the plaintiff's trial exhibits was that of a

---

8. Pa.R.E. 803, Hearsay exceptions, availability of declarant immaterial . . .

"(6) Records of regularly conducted activity. A memorandum, report, record or data compilation, in any form, of acts, events or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11) [self-authentication of certified domestic records of regularly conducted activity evinced by written declaration of custodian or other qualified person certifying their compliance with Rule 803(6) upon prior notice of the intention to introduce such evidence and of its availability for inspection], Rule 902(12) [self-authentication of certified foreign records by the same means], or a statute permitting certification, unless the sources of information or other circumstances indicate a lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation and calling of every kind, whether or not conducted for profit." Pa.R.E. 803(6).

"witness with knowledge" pursuant to Pa.R.E. 901(b)(1);[9] (d) that the exhibits are self-authenticating pursuant to Pa.R.E. 902(7),[10] because they bear trademarks and inscriptions affixed by Citibank; and (e) that the court abused its discretion in precluding the exhibits without any reference to their trustworthiness or untrustworthiness pursuant to the standards established in *Fauceglia v. Harry,* 409 Pa. 155, 185 A.2d 598 (1962), and *Ganster v. Western Pennsylvania Water Co.,* 349 Pa. Super. 561, 504 A.2d 186 (1985).[11]

The plaintiff submitted post-trial argument in a brief submitted on October 9, 2009, or some two months following the submission of its memorandum of law in support of the motion for post-trial relief, to which were appended the above-listed five exhibits the plaintiff had proffered at the trial. It is here recalled that the plaintiff also provided in its brief a correction of plaintiff's prior assertion in the said memorandum of law that Citibank had initially sold the defendant's account to a purchaser other than NCOP Capital Inc., a mistake belying the

---

9. Pa.R.E. 901(b)(1) provides the illustration or example that the testimony of a witness with knowledge that a matter is what it is claimed to be may meet the requirement of authentication or identification of evidence as a condition precedent to its admissibility by supplying sufficient support for a finding that it is what its proponent claims it to be. Pa.R.E. 901(a) and (b)(1).

10. Pa.R.E. 902(7) provides that extrinsic evidence of authenticity is not required with respect to "[t]rade inscriptions and the like . . . purporting to have been affixed in the course of business and indicating ownership, control or origin." Pa.R.E. 902(7).

11. Plaintiff's counsel is mistaken in this regard, apparently having forgotten or disregarded his dialogue with the court during the trial wherein the court questioned whether plaintiff's counsel had presented the testimony of a custodian or other qualified witnesses who could establish the trustworthiness of those documents. (N.T. 82.)

integrity repeatedly asserted by the plaintiff in urging that an unbroken chain in plaintiff's receipt of this evidence guaranteed its reliability in and of itself (Plaintiff's brief in support of motion for post-trial relief, unnumbered p. 2.)

Defendant contended in the within brief that rule 803(6)'s inclusion of "data compilation, in any form" as a hearsay exception necessarily encompassed the computerized records or statements submitted at the trial because today's business climate demands a "high degree of accuracy" therein; because the said records are customarily checked for correctness; and because those who keep those records are trained in habits of "precision", with citation to the case authority of *Papach v. Mercy Suburban Hospital,* 887 A.2d 233, 246 (Pa. Super. 2005). (*Id.,* unnumbered p. 4.) The plaintiff further stated that all persons, including its trial witness, Mr. Venditti, who were involved in the alleged "compilation" of the submitted media acted in the course of a regularly conducted business activity and not as bystanders to that event. (*Id.*) In plaintiff's view, Mr. Venditti, who clearly testified that he had never been directly employed by Citibank or by any other issuer of credit cards; that he possessed absolutely no knowledge of Citibank's, nor of NCOP's record-keeping schemes and could not personally attest to their trustworthiness, accuracy, freedom from corruption, nor how they were maintained or backed up; and that he could not show whether or not they were protected from corruption or hacking, was not an "outsider" or "bystander" to that record-keeping process because he was "an experienced corporate officer with years of experience in the credit industry" acting within the scope of his duties. (*Id.*; N.T. 34-36, 50-56.) In fact, all this wit-

ness could offer in the way of personal knowledge regarding the within business records was a bald-faced presumption that the records proffered as plaintiff's trial exhibits had been "SAS-70 qualified", and the statement that this presumption was the "extent of his knowledge" of those records. (N.T. 52-54.) Yet, when pressed by the court to define what was meant by "SAS-70", Mr. Venditti offered a mere boilerplate explanation that it "is a test on multiple levels and multiple fields of a computer system to ensure data integrity in all aspects; data protection, virus corruption protection and everything else" and nothing more. (N.T. 77.)

The limits of Mr. Venditti's knowledge were vast. He could offer no clear response as to whether the 1996-1997 Citibank card agreement proffered by the plaintiff applied to the defendant, and admitted that there is no sign of a "23.99 percent" interest rate on the face of that document. (N.T. 61-65.) Plaintiff's counsel also acknowledged that the debts sought to be collected by the plaintiff had been "written off" as uncollectible by Citibank, for reasons arguably including the problem of proving them due and owing, as was the issue underlying the preclusion of plaintiff's evidence in the instant case. (N.T. 84-85.) Nevertheless, even if plaintiff had submitted a valid contract upon which to sue the defendant for collection of the alleged debt, plaintiff never provided a sufficient foundation through a qualified witness to show that a reliance on Citibank's business records and those submitted through NCOP Capital Inc. was justified. Nonetheless, plaintiff has submitted a plethora of reasons as to why its evidence should be unquestioningly admitted, including boilerplate claims that the banking industry is

required to adhere to policies of honest, trustworthy and meticulous record keeping according to public policy as well as state and federal statutory schemes. However, Mr. Venditti could not say for certain whether those requirements had actually been followed in the preparation and maintenance of these records because, simply put, he was never in a position to know.

It is the law of this Commonwealth that, so long as a witness can provide sufficient information relating to their preparation and maintenance to justify a presumption of the trustworthiness of the business records of a company, a basis is provided to offset the hearsay character of the evidence presented. *In re Estate of Indyk,* 488 Pa. 567, 413 A.2d 371 (1979); *Fauceglia v . Harry,* 409 Pa. 155, 185 A.2d 598 (1962); and *Ganster v. Western Pennsylvania Water Company,* 349 Pa. Super. 561, 504 A.2d 186 (1986). Pennsylvania's Uniform Business Records as Evidence Act, 42 Pa.C.S. §6108 provides, in relevant part, as follows:

"A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of it preparation, and if it was made in the regular course of business at or near the time of the act, condition or event and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such to justify its admission." 42 Pa.C.S. §6108.

The question of whether documents should be admitted under the "business records" exception to the hearsay rule is within the discretionary power of the trial court, provided that such discretion is exercised within the

Uniform Business Records as Evidence Act. *Boyle v. Steiman,* 429 Pa. Super. 1, 15, 631 A.2d 1025, 1032 (1993). It is not essential under the Act to produce either the person who made the entries or custodian of the record at the time the entries were made, nor does the law require that a witness qualifying business records have personal knowledge of the facts reported in the business record. *In re Estate of Indyk, supra,* 488 Pa. at 573, 413 A.2d at 373; *Boyle v. Steiman, supra,* 429 Pa. Super. at 15, 631 A.2d at 1032. As long as the authenticating witness can provide sufficient information relating to the preparation and maintenance of records to justify a presumption of trustworthiness for the business records of a company, or in this case, companies, a sufficient basis is provided to offset the hearsay character of the evidence. *Id.* Mr. Venditti's admission to knowing nothing regarding any of the foregoing regarding Citibank's and NCOP's business records utterly disallowed him from attesting to their trustworthiness, and hence, precluded their admission as evidence into the record.

With regard to the plantiff's urging of the unquestioning admission of computerized records by dint of their purportedly mythical status of dominating the current business record keeping environment, Professor Edward Ohlbaum teaches us that computer generated records are admissible as records of a regularly conducted activity if: (1) the entries justify the four foundational requirements of business records; (2) there is evidence that that computer process produces an accurate result when correctly used and properly operated; and (3) it was used and operated properly with respect to the records presented. Ohlbaum, *Pennsylvania Rules of Evidence* (2008-

2009 edition), section 803.07(18). The plaintiff presented no evidence or testimony describing the computer processes of Citibank and NCOP Capital Inc., nor credible testimony from Mr. Venditti as to whether or not they produced accurate results or were properly operated so as to produce the exhibits presented. All the plaintiff has ever proffered as reasoning for the admission of its trial exhibits has been the boilerplate contention that, since plaintiff uncritically accepts these records as accurate, and adheres to its self-serving belief that Mr. Venditti is an "insider" with adequate knowledge of the regularity of the record-keeping process to qualify the challenged records as reliable and trustworthy, the court should also accept them uncritically. *In re Estate of Indyk, supra,* 488, Pa. at 573, 413 A.2d at 373. Nevertheless, even plaintiff's own proffered legal case authorities require that an actual insider to the instant record-keeping process, and not an admitted outsider like Mr. Venditti, must attest to the authenticity of business records so as to remove the taint of hearsay necessary for warranting their admission into evidence by a court.

The Pennsylvania Supreme Court, writing in 1962 in *Fauceglia v. Harry, supra,* 409 Pa. at 158-59, 185 A.2d at 600, in terms that seem terribly quaint in 2010 about why Pa.R.E. 803(6) and the Business Records as Evidence Act, *supra,* do not require that a person who testifies have personal knowledge of the matter recorded (as distinguished from personal knowledge of the manner in which such matters are recorded and kept, a difference gone largely unregarded by the plaintiff), stated:

"The general purpose of the Business Entry Statute was to enlarge the old common-law shopbook exception

to the hearsay rule by eliminating the many illogical distinctions which had evolved during the period when the one-man type of business enterprise was the predominant form of business organization. Today, instead of a single shopkeeper who transacts and records the sale, there are a myriad of sales girls, department heads, bookkeepers, *etc., etc., etc.,* who compile summaries and consolidate the records made by others. Quite often, different individuals have personal knowledge of the various phases of a transaction so that no one individual has knowledge of the entire transaction. In addition, the frequent turnover of personnel often makes it impossible to identify the employee—if it were only one—who took part in the transaction. Under these circumstances, to require the entrant to have personal knowledge of the event recorded, and to require proof of the identity of the recorder, would exclude almost all evidence concerning the activities of large business organizations—a result diametrically opposed to the purpose and spirit of the Uniform Business Records as Evidence Act.

"In *Panama Canal Co. v. Stockard & Co.,* 391 Pa. 374, 381-82, 137 A.2d 793, 798 (1958), we indicated the necessity for admitting business records where the recorder did not have personal knowledge and where those who did have personal knowledge were not identified, we said: '. . . the . . . [checkers] have in many cases changed and the former ones cannot be found; in the next place, it cannot always be ascertained accurately which . . . [checker] was concerned in each of the transactions represented by hundreds of entries; in the third place, even if they could be ascertained, the production of scores of . . . [checkers], to attend court and identify in tedious

succession the detailed items of transactions would interrupt and derange the work of the. . . [carrier], and the evidence would usually be obtained at a cost practically prohibitory; and finally, the memory of such persons, when summoned, would afford little real aid. 5 Wigmore Evidence §1530. . . .' *Therefore, as long as someone in the organization has personally observed the event recorded, the evidence should be admitted.*" *Id.* (emphasis added) (footnotes ommited)

Accord: *Commonwealth v. Bardolph,* 123 Pa. Super. 34, 43, 186 A. 421 (1936), *aff'd,* 326 Pa. 513, 192 A. 916 (1937) (holding it sufficient if books were verified by one in control, although the entries therein were not made by him, if he knew them to be regular entries); *Fauceglia v. Harry, supra,* cited by the plaintiff as a gold standard in this regard (custodian of statutorily self-authenticating U.S. military medical records testified that all entries had been made by those with personal knowledge of the material they were adding to those records); *Boyle v. Steiman, supra,* (private detective agency's business records were admissible when a witness was able to describe the process by which the records were made by himself, his brother and his father).

Conversely, as noted by the Honorable Mark I. Bernstein in section 803(6)[5] on p. 721 of the 2008 edition of *Pennsylvania Rules of Evidence* with comments and annotations (Gann Law Books, Newark, N.J.), the courts of this Commonwealth have held that where there is no witness available with the ability to testify as to the mode of preparation of a purported business record, it will be deemed inadmissible. *Peled v. Meridian Bank,* 710 A.2d 620, 626 (Pa. Super. 1998), *appeal denied,* 556 Pa. 711,

729 A.2d 1130 (1998) (business records of a bank inadmissible because the witness did not work for that bank and had no knowledge of the method of preparation and maintenance of its records). Further, a 2001 amendment to Pa.R.E. 803(6) permits business records to be authenticated by certification in a writing complying with the mandates of Pa.R.E. 902(11) or 902(12) by a custodian or other qualified person subject to penalties for false statements as to all of the facts necessary for admission of that evidence at trial. Plaintiff has presented no such certification authenticating its evidence before this court.

Plaintiff's continued insistence that Mr. Venditti's knowledge and experience in the field of collecting outstanding credit card debt makes him an "insider" with the requisite credibility and information to remove the taint of double hearsay from his testimony about Plaintiff's exhibits cannot make him so. The presence of Citibank trademarks on the card agreement and billing statements cannot overcome this deficit. The simple fact is that no proper foundation for the evidence sought to be admitted by plaintiff was ever properly laid.

## CONCLUSION

The standard for appellate review of a trial court's decision regarding the admissibility or preclusion of trial evidence is extremely narrow, necessitating that such a ruling will not be reversed absent a manifest abuse of discretion. *Eichman v. McKeon,* 824 A.2d 305, 319 (Pa. Super. 2003). To constitute reversible error, an evidentiary ruling must be shown by an appellant to be not only erroneous, but also harmful or prejudicial to its interests.

*Ettinger v. Triangle-Pacific Corporation,* 799 A.2d 95, 110 (Pa. Super. 2002). Further, a trial court's decision regarding the grant or refusal to grant a new trial will not be reversed absent an abuse of discretion or error of law, and if the rulings in question in an appeal were on the evidence, those which did not affect the verdict will not provide a basis for disturbing it. *Antoniotti v. Eckels,* 840 A.2d 1013, 1015-16 (Pa. Super. 2003). In making such a determination, the appellate court must consider whether a new trial would have produced a different verdict from the original. *Gunn v. Grossman,* 748 A.2d 1235, 1239 (Pa. Super. 2000). If there is any support in the record for the trial court's denial of a new trial, its order will be affirmed. *Folger ex rel. Folger v. Dugan,* 876 A.2d 1049, 1054 (Pa. Super. 2005).

Three elements are necessary to properly plead and prove a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Omicron Systems Inc. v. Weiner,* 860 A.2d 554, 564 (Pa. Super. 2004). It has been shown that there was neither error nor abuse of discretion in the court's preclusion of the plaintiff's five trial exhibits, and where the plaintiff has claimed harm or prejudice resulting therefrom, such is of no moment inasmuch as the plaintiff never met its threshold burden of proving the existence of a contract that the defendant allegedly breached. In such an instance, a new trial could not have resulted in a verdict for the plaintiff. Cf., *Capital One Bank (USA) NA v. Clevenstine,* 7 D.&C.5th 153 (Centre Cty, 2009) (dismissing complaint and allowing more specific pleading on ground that an unsigned credit card agreement pre-dating the initiation of a credit card ac-

count by four years cannot be enforced by the original lender); and *Chase Bank USA v. Rader,* 8 D.&C.5th 297 (Lancaster Cty, 2009) (original credit card lender's failure to produce a signed and dated credit card agreement and complete statement of charges allegedly owed by the defendant merited dismissal of the plaintiff's motion for summary judgment).

Moreover, based on plaintiff's failure to establish the trustworthiness and reliability of the proffered computerized business records, by authenticating them through the testimony of "a person with knowledge . . .", the court did not manifestly abuse its discretion when it precluded their admissibility under the business records exception to the hearsay rule set forth in Pa.R.E. 803(6).

For all of the foregoing reasons, the court's verdict in this action, and the evidentiary rulings that gave rise to that verdict, must not be disturbed on appeal.